# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
## AT KNOXVILLE, TENNESSEE

United States of America,                    :
                                             :
                   Plaintiff,                :
                                             :
vs.                                          :          Case No. 3: 08-cr-143
                                             :
Donald Ray Reynolds, Jr.,                    :          **Motions/Daubert Hearing**
 and Nathaniel Smith, Jr.,                   :
                                             :
                   Defendants.               :

     Transcript of proceedings before the Honorable Dennis H. Inman,

U. S. Magistrate Judge, on May 13th, 2009.

Appearances:
                              On behalf of the Plaintiff:

                              Tracee Plowell, Esq.
                              D. Gregory Weddle, Esq.
                              U. S. Attorney's Office
                              Knoxville, Tennessee


    On behalf of Deft. Reynolds:           On behalf of Deft. Smith:

    John E. Eldridge, Esq.                 Donny M. Young, Esq.
    Knoxville, Tennessee                   Knoxville, Tennessee


Court Reporter:
                              Donnetta Kocuba, RMR
                              800 Market Street, Suite 132
                              Knoxville, Tennessee 37902
                              (865) 524-4590

# I N D E X

Defendant Smith's Motion to Suppress and for
    a Franks Hearing:                                      4


Defendant Reynolds' First Motion to Suppress:            7


Defendant Reynolds' Second Motion to Suppress:          22


Defendants' Daubert Motion:                             31

| Plaintiff's Witnesses: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Danielle Barto | 28 | 29 | – | |
| Dr. Hacene Boudries | 32 | 59 | | |

| Plaintiff's Exhibits: | Identified | Received |
|---|---|---|
| 1 - Printout from Powerpoint Presentation re: drug measurements | 41 | 42 |
| 2 - Printout from Powerpoint Presentation re: Ion Trap Mobility Spectrometry Fundamentals | 56 | 59 |

1   (Whereupon, Wednesday, May 13th, 2009, Court convened in
2   the following matter at 9:04 a.m.)
3   THE COURT:   Good morning.
4   COURTROOM DEPUTY:   Docket Number 3:08-cr-
5   143, United States of America versus Donald Ray Reynolds, Jr.,
6   and Nathaniel Smith, Jr. John Eldridge and John Honeycutt are
7   here on behalf of Defendant Reynolds. Defendant Reynolds
8   present and ready to proceed?
9   MR. ELDRIDGE:   Present and ready to proceed.
10   COURTROOM DEPUTY:   Donny M. Young is here on
11   behalf of Defendant Smith. Is the Defendant present and ready to
12   proceed?
13   MR. YOUNG:   We're present and ready to proceed,
14   your Honor.
15   COURTROOM DEPUTY:   And, your Honor, Tracee
16   Plowell and Gregory Weddle are here on behalf of the Government.
17   Is the Government ready to proceed?
18   MS. PLOWELL:   Present and ready.
19   THE COURT:   All right. Have any of you by any
20   chance discussed among yourselves the logical order in which to
21   take up these motions?
22   MR. ELDRIDGE:   No, we've not had that
23   conversation.
24   THE COURT:   I don't care, because I don't really know
25   what I'm getting ready to get into here.

1    MS. PLOWELL:   Your Honor, I suggest that we do the

2    motions that don't require testimony first and then to argue those,

3    those motions first, and then do the evidentiary hearing after.

4    THE COURT:   Okay.  Which motions, in your opinion,

5    require no testimony?

6    MS. PLOWELL:   Well, I only think that the <u>Daubert</u>

7    hearing requires testimony.  I think the rest of the motions, as they

8    were presented, can be decided on the pleadings.

9    THE COURT:   We'll see what happens.  I'm just going

10   to take them in the same order I've got them, which, coincidentally

11   enough, Ms. Plowell, the <u>Daubert</u> hearing is the last one in my

12   book, anyway, so– Okay.  First one on the menu then is Mr. Smith's

13   motion to suppress evidence and his concomitant request for a

14   <u>Franks</u> hearing.  It's Document 54.  Mr. Young?

15   MR. YOUNG:   Your Honor, we have nothing new to

16   add to this motion except Mr. Smith questioned getting a search

17   warrant for a FedEx package out of Chicago.  I went through

18   discovery and I did not find a search warrant or an affidavit

19   supporting a search warrant in discovery that I had.

20   I received the search warrant this morning from Ms. Plowell.

21   Of course, I've had no opportunity to review that to see if there are

22   any issues regarding that search warrant.  I guess at this time we

23   would ask that that particular issue of Mr. Smith's motion be

24   reserved or for a later date so I can have an opportunity to review

25   the search warrant to see if there are any issues regarding it.

1    I've spoken to the Government, and she doesn't have any

2    objections to that. Other than that, your Honor, I've got nothing

3    additional to add.

4        THE COURT:   Mr. Sanders and I discussed that search

5    warrant.  Neither of us have seen the Illinois search warrant either,

6    so– but it has been furnished to Mr. Young?

7        MS. PLOWELL:   It has, your Honor.  I thought I had

8    faxed a copy over to your chambers as well, but I have a copy.

9        THE COURT:   Faxing anything to me, Ms. Plowell, is

10   consigning it, potentially, to the ash heap of history, especially if I

11   am in charge of the fax machines.  You may have, but I–

12       MS. PLOWELL:   Okay.  And just for the record, there

13   is– discovery in this case is voluminous.  There are at least 5,000

14   pages of documents.  So we think it's in there and counsel may

15   have missed it.  But just we don't want to hide the ball on anything.

16   So he asked for a copy this morning, and I've provided that, and I

17   will provide one to the Court as well.

18       In addition, your Honor, you know, it's our position that the

19   search warrants, of course, will be reviewed simply on the four

20   corners.  There was another issue about the search incident to the

21   Defendant's arrest for the package.

22       I don't have the officers from Chicago here to testify about

23   that primarily because it was our position that that should be

24   decided on the pleadings.  Because they did not raise any or contest

25   any issues of fact with regard to that.

1     But if your Honor does, is inclined to grant that, I've spoken

2     to the agents in Chicago, and they are available any day this month

3     for another hearing on that issue, if you desire to have an

4     evidentiary hearing on that.

5          And here is a copy of the search warrant for your Honor.

6          THE COURT:   Thank you. Mr. Young, you just got this

7     this morning, right?

8          MR. YOUNG:   That's correct, your Honor.  And it may

9     very well have been on some discs I have received that I have not

10    been able to open because of the technology the Government uses

11    that does not comport with my computer. But I went through this

12    the last few days and I just did not see it, and–

13         THE COURT:   Well, let's see. When is the trial date?

14         MR. YOUNG:   September the 28th, I believe.

15         THE COURT:   Okay.  We're blessed with time, then,

16    aren't we? How much time do you request as far as filing any

17    motions with reference to the Illinois search warrant if, in fact, you

18    determine to do so?

19         MR. YOUNG:   I could have something filed by the first

20    of June, your Honor.  The rest of this month is basically shot for

21    me.

22         MS. PLOWELL:    One small issue with regard to that,

23    your Honor.  The detective who did the warrants and who was

24    present at the arrest of Mr. Smith is on a military assignment for

25    the whole month of June.  But he's available anytime in May and

1   then after June, for testimony.

2           THE COURT:   September trial date, I can't see that

3   being a problem.

4           MS. PLOWELL:   Okay. I just wanted you to be aware.

5           THE COURT:   Mr. Young, if we put a– when you say

6   first of June, do you mean that literally, June 1? Would that suit

7   you as far as filing any motions if you determine to do so?

8           MR. YOUNG:   Yes, it would, your Honor.

9           THE COURT:   Ms. Plowell, if he does file a motion, can

10  you file a response within ten days?

11          MS. PLOWELL:   Yes, your Honor.

12          THE COURT:   And I think I propose to handle it this

13  way. If Mr. Young does file a motion, that then we can just, the

14  three of us can consult, and we'll just pick a hearing date.

15          MS. PLOWELL:   That's fine. Thank you.

16          MR. YOUNG:   Thank you, your Honor.

17          THE COURT:   All right. Which takes us to Mr.

18  Reynolds' motion to suppress number one.

19          MR. ELDRIDGE:   Your Honor, does the Court have a

20  working copy of the search warrant?

21          THE COURT:   Yes, sir.

22          MR. ELDRIDGE:   Okay. And I'm sure the Court's

23  familiar with it. What I want to address, please the Court, is, it is

24  our position that, in this particular search warrant, that what we've

25  got is a search warrant based on informants' information.

1    And what the courts have said, particularly Sixth Circuit has

2  said, is that when the Court is looking for probable cause in a

3  warrant based on an informant, what needs to be in the affidavit is

4  some information to give the basis of the informant's knowledge or

5  information about the reliability of the informant or corroborative

6  evidence possessed by the Government.

7    It is our position that– and, of course, I'm certainly aware that

8  we're dealing with the totality of the circumstances.  But this gives

9  us some way of looking at this particular search warrant.  Because

10  it does not have, I suggest, there's nothing in the four corners of

11  the search warrant to talk about to address the issue or the basis of

12  the informant's knowledge.

13    We have CW-1 and CW-2.  The affidavit, the affiant simply

14  starts talking about what CW-1 related.  No basis of where this

15  informant got the information, not a– nothing; not that this

16  informant knew him or was an associate or went to school with him

17  or did anything or where or how she had this information; only that

18  the affiant simply starts giving information about what the

19  informant said.

20    The same holds true with CW-2 in terms of the basis of the

21  knowledge.  There is simply no information; only that this person

22  knows Mr. Reynolds.  So I suggest that we're left with the second

23  thing.

24    The second thing that we are told to look at is the reliability

25  of the informant.  And when you comb the search warrant, you see

that the only statement about the reliability of either CW-1 or CW-2 is the conclusory– the simply conclusion that CW-1 is a reliable informant and information provided by CW-1 has been deemed accurate.

I'm sure the Court is familiar with how informants can be– how their reliability can be bolstered by talking about how they provided information in the past which led to X,Y,Z prosecutions and convictions, et cetera.

None of that is here. So what we are left with is simply what the affiant says corroborates the information that has been provided by CW-1 and CW-2. And I suggest that when you break that down, what you've got is some telephone numbers.

The informant supposedly gives information to the affiant about two telephone numbers that Mr. Reynolds– sorry. The informant says Mr. Reynolds has these two telephone numbers, and as it turns out, these two telephone numbers are also identified as being in the phones of two persons who are arrested; someone in St. Louis, and I suggest that– they talk about a drug bust in St. Louis, the affiant talks about a drug bust in St. Louis.

I would also remind the Court that none of the information from the informant, supposedly from the informant, has anything to do with St. Louis. The informant wants the– the affiant wants the Court to believe that there is a big drug operation going on from Tennessee to Arizona and Chicago, but yet it talks about a drug bust in St. Louis.

The person arrested in St. Louis had, according to the affiant, the phone number, one of the phone numbers, that were identified by the informant number one in his cell phone. Likewise, the affidavit also identifies that the person arrested in Chicago, a Nathaniel Smith, also had that phone number in his phone.

So what the affiant wants the Court to believe is that if someone is arrested and that person has your phone number in his phone, then that is the basis of probable cause to come search your home.

The same reasoning holds true, I suggest, with the Cadillac Escalade. Again, an attempt by the affiant to corroborate information which has been provided, supposedly provided, by an informant. The Cadillac Escalade is apparently driven by someone who was arrested, Nathaniel Smith, and that Cadillac is traced back to having been owned by Mr. Reynolds at one point.

That's the second piece of corroboration that the affiant wants the Court to find probable cause on.

And then there is the trash inspection, and I would invite the Court's attention to that in Paragraph 21, particularly what it is and what it is not. What it says is that, "I found some trash. I found materials consisting of heat-sealed clear plastic, packing tape, grease and coffee grounds inside some plastic, one of which maintained the form of what your affiant knows on his training and experience to be the size and shape of a kilogram of cocaine."

I would suggest to you that if you check most anybody's home

trash, you would find grease and coffee grounds and plastic, heat-sealed or not, and perhaps packing tape. Again, an effort on the part of the affiant to ask the magistrate to take a leap and say this is evidence of cocaine, because you find coffee grounds and grease in the trash.

And then we get over to what is a large bulk of the affidavit, which is a listing of vehicles. And if you look at that listing of vehicles, in Paragraph 26, you will see that Mr. Reynolds, yes, Mr. Reynolds did purchase a number of vehicles. But check out the purchase dates. They are sequential.

What occurred, I would suggest to you, is that Mr. Reynolds purchases a vehicle, sells it; purchases a vehicle, sells it; purchases a vehicle, sells it, and on down the line. And I suggest that is innocent activity.

There's lots of fluff in this affidavit, lots of attempts by the affiant to get the magistrate to buy into an allegation that Mr. Reynolds is dealing in cocaine and marijuana. For example, in Paragraph 22 the affiant talks about a keypad style gun safe, a keypad– a large-style, keypad-style gun safe, and wants the magistrate to believe that that is some evidence of a crime.

If you can buy it on the open market and you can have it shipped to your house, what is wrong with that? Completely legal.

The affiant wants the Court to believe, as we've talked about, that all of these things point to Mr. Reynolds being a dealer and that we're going to find lots of evidence of drug dealing at his

1  home.

2  I would suggest to the Court that if you assume that Mr.

3  Reynolds is a legitimate businessman, if he is, in fact, selling cars,

4  if he is, in fact, in the music business and is traveling to Arizona

5  for that purpose or for other purposes, again, quite innocent; if that

6  is his market for what he is selling, regardless of what it is,

7  whether it's vehicles, promotion of music, dogs, et cetera,

8  whatever he's selling, then what appears to be airplane flights and

9  what appears to be purchases and sales of cars, I suggest to you, is

10 legitimate.

11 I am sure that we will hear about the good faith exception, and

12 let me talk very briefly about that and tell you what we rely upon.

13 That's simply that the courts have said, as I've cited in my brief,

14 what we're relying upon is where the affidavit was so lacking in

15 indicia of probable cause as to render official belief in its existence

16 entirely unreasonable.

17 That's what we're relying upon. If it is, it is; and if it's not,

18 it's not. I suggest to you that there is not sufficient indicia of

19 probable cause to support the issuance of this search warrant.

20 Now, the other issue that I raised in this search is the issue of

21 what was seized, and I particularly suggest that there were several

22 items seized that had nothing to do with the search warrant issue.

23 Most particularly, I have listed cell phones and computers.

24 And if you look at the first page of the search warrant or, in

25 fact, if you look at the search warrant, not the affidavit, the search

1    warrant itself says, "You are commanded to go get the following."

2        In terms of what the Court– I'm sorry– what the affiant is

3    relying upon or what the Government will be relying upon to say

4    it's okay to seize a computer is this language, "computerized

5    records and papers reflecting names, addresses and telephone

6    numbers of drug customers and suppliers."

7            THE COURT:   What line are you at?

8            MR. ELDRIDGE:   I'm sorry. I am seventh line down.

9            THE COURT:   Okay.

10           MR. ELDRIDGE:   If the affiant wanted, and the Court

11    was directing, a seizure of computers, I guess what the language

12    should be is simply something like, "Go seize computers with

13    records in them of paper– records in them reflecting names,

14    addresses and telephone numbers of drug users."

15       It doesn't say computers; it says computerized records.  And

16    I'd suggest to you that there is– it's a completely different animal.

17    Computerized records is not the same thing as the computers.

18           THE COURT:   How would you seize computerized

19    records without seizing the computer?

20           MR. ELDRIDGE:   If they had been printed off, I

21    suppose anything that's printed off a computer is a computerized

22    record. I suppose this is a computerized record.

23           THE COURT:   Well, using the common sense lexicon,

24    when someone speaks of computerized records, does not everyone

25    recognize that we're talking about records that are stored on a

1  computer?  Because everything– and I agree with you, Mr.

2  Eldridge– everything now is generated electronically.  There may

3  be somebody who's got a typewriter someplace in the universe

4  now, but it's all generated by word processing.

5      So when you say computerized records, don't we all instantly

6  recognize that we're talking about records that are on a computer

7  that, to be sure, could be printed off in hard form, but we're still

8  talking about they're in that computer?

9          MR. ELDRIDGE:    Well, there is that rule of

10  construction that says you look at what's– you look at what's listed

11  with it, and what you read is computerized records and papers.

12          THE COURT:   I agree, which, I guess, either–

13  reinforces my illustration; papers on the one side, computerized

14  records meaning stuff in the electronic guts of the computer on the

15  other.

16          MR. ELDRIDGE:  Well, I respectfully disagree with

17  you.

18          THE COURT:   Well, that's okay.

19          MR. ELDRIDGE:    I understand.  And, likewise, your

20  Honor, with telephones, it's so simple to say go seize telephones;

21  cellular phones, go seize cellular phones.  The next line, what does

22  it say?  "Telephone equipment."

23      And when you're again looking at the balance of what is on–

24  in that facet of this search warrant, look at where the semicolon is,

25  and then we'll look where the next semicolon is.

1    THE COURT:   Now, with regard to the telephone

2 equipment, you're asserting that those two words do not embrace

3 cell phones?

4    MR. ELDRIDGE:   If you read on, "telephone

5 equipment, answering machines, cassette tapes and paging

6 devices." Again, if you want to seize a telephone, say a telephone.

7    What is telephone equipment? Telephone equipment, I

8 suggest to you, is not a telephone; it's something else. Telephone

9 equipment is the cord, is the switching boxes. It's all those things

10 that Bellsouth uses and what the technicians put in and take care of

11 all the time.  That's telephone equipment.

12    If you want to seize telephones, say so; that's the argument.

13 Thank you.

14    THE COURT:   Mr. Eldridge, thank you, sir.

15    MS. PLOWELL:   Well, your Honor, I would submit

16 that the Defendant is engaging in the kind of line-by-line parsing

17 of the affidavit that is heavily criticized by the Supreme Court in

18 Gates and its progeny.

19    The approach to reviewing an affidavit for probable cause is,

20 of course, the totality of the circumstances.  The Sixth Circuit and

21 the courts and actually every circuit in the country has been very

22 clear about what information you need to corroborate an informant.

23    The Sixth Circuit, in Allen (sp) and in Williams,

24 demonstrated that something that is innocuous as police

25 surveillance to a location was sufficient corroboration of an

1  informant's information and provides a basis for the judge to find

2  probable cause warrant.

3      In this case, your Honor, as is set forth in our response to the

4  Defendant's motion, there are several instances where the

5  informant's information has been corroborated independently by

6  law enforcement.

7      For example, the CW-1 informed law enforcement personnel

8  that the Defendant Reynolds is engaged in frequent trips, he drives

9  from Nashville and goes to Arizona to conduct drug trafficking

10  activities.  That is corroborated through records from Southwest

11  Airlines and other airlines that the Defendant was, in fact, taking

12  those trips.

13      That's just one example of independent corroboration of that

14  informant's information. CW-1 also informed that Defendant's–

15  one of his drug sources, or co-conspirators, was an individual

16  named Tony and provided a number.

17      That was the individual Antonio, "Tony," Santa Cruz, who

18  was arrested in St. Louis with a quantity of marijuana at the

19  airport. In a search of that individual's phone, the Defendant's

20  telephone number was in, along with Mr. Nugget Smith's,

21  Nathaniel Smith's telephone number, was found in Tony Santa

22  Cruz' telephone.

23      That's another example of independent corroboration of the

24  informant's information, and that's set forth to the issuing

25  magistrate-judge.

1    As another example, with regard to the reliability and the
2    corroboration of the informant's information for CW-2, CW-2
3    indicates that this defendant was furnishing a large number of
4    vehicles for cash. That's corroborated by the records from CW-2,
5    but also corroborated from the Tennessee Department of State
6    Vehicle Registry, that indicates that those transactions did, in fact,
7    occur.

8    Further, Mr. Nathaniel, "Nugget," Smith was arrested in
9    Chicago in a vehicle that had been purchased by the Defendant
10    Reynolds from American Auto Exchange. That's set forth in the
11    affidavit. And he was arrested with that vehicle in July, when he
12    was in possession of about 5,200 grams of marijuana. That
13    information, again, corroborates the informant's information.

14    Furthermore, the informant set forth that there was a scheme
15    to send contraband drugs through the mail using the FedEx. Well,
16    when the Defendant, co-defendant, Nathaniel, "Nugget," Smith,
17    was arrested in Chicago, he was arrested with a box of marijuana
18    that had been sent through the mails using the FedEx system. That
19    independently corroborates the information from the informant.

20    So I'd submit to your Honor, looking at the totality of the
21    circumstances, as this court is required to do, you can see that the
22    informant's information has been corroborated by law enforcement
23    and deemed to be reliable and that there is a sufficient basis for the
24    issuing magistrate-judge to have found probable cause.

25    In addition, I need to comment with regard to the trash pull,

just so that the record is clear on what was actually recovered from the trash. What was not recovered was a quantity of coffee grounds, a quantity of grease and a quantity of heat-sealed wrapping materials.

What was, in fact, recovered was one heat-sealed plastic wrapping material that contained grease and coffee grounds that was in a brick-like shape similar to that of a kilogram of cocaine.

The agent knows, based on his almost 20 years of law enforcement training and experience, that– and this is set forth in the affidavit– that drug traffickers typically, in order to mask the scent of cocaine from the drug detection dogs, will use coffee grounds and grease so that they can avoid detection by the drug trafficking dogs when they're shipping cocaine.

So this is not simply innocent, and that everybody has coffee grounds, grease and tape in their trash bins. What I would submit, your Honor, is that it is quite unusual for a normal, non-drug trafficking citizen to have the packaging, as it were, as it was recovered from the trash in their waste receptacles.

So that, looking at the totality of all of the circumstances there, you can quite clearly see that there was a sufficient basis for the magistrate-judge to find probable cause in the search warrant.

Next, with regard to the Leon issue, your Honor, there is no showing whatsoever that this warrant was based on a reckless falsity or that the magistrate-judge abandoned its judicial rule by failing to be neutral and detached. The warrant is clearly not

1  lacking in indicia of probable cause as to cause belief in its

2  existence entirely unreasonable.

3      And the officers were not dishonest or reckless in preparing

4  the affidavit, neither did they harbor an objectively reasonable

5  belief in the existence of P.C. So I'd submit that, under Leon, your

6  Honor, if you were to find that there was something faulty with the

7  search warrant, the search warrant is still good based on Leon.

8      Now, and I guess one of the things that I need to raise, and

9  have raised it in my response, was this kind of veiled request for a

10  Franks hearing, stating that the officer who was the affiant in the

11  case made some sort of false or recklessly made statements in the

12  affidavit.

13      And I would submit, your Honor, first, those are most serious

14  allegations to put forth, and there was not even a preliminary

15  showing. There's no affidavit, there was no offer of proof, and I

16  would ask this court to simply reject that argument completely

17  straight out of hand there.

18      Because there's no showing whatsoever that the agent

19  engaged in any of that activity. And it always concerns me when

20  such statements are made, because they are most serious

21  allegations.

22      That's why the Supreme Court has said you need to have an

23  affidavit accompanying your offer of proof, and none of that was

24  given. So the veiled request for a Franks hearing, I think, should

25  summarily be denied.

1     Finally, the items that were seized are all reasonably related
2   to the offense here which forms the basis of the search warrant.
3   The cell phones clearly are telephone equipment, your Honor. I
4   don't know what else would be telephone equipment.

5     It's got to be handsets and phones and things that you use to
6   make a telephone call. Cell phones clearly constitute telephonic
7   equipment. Computerized records are obviously obtained on a
8   computer.

9     Now, there could be an argument that in order to get into
10  those records we needed a separate search warrant. But I would
11  submit that we don't, because it's computerized records, not to
12  mention, your Honor, there has been no allegation that anything
13  that we seized from– that was recovered from the records on the
14  computer, there is any sort of need for that to be suppressed under
15  any basis.

16    The other issue that was raised was the money counters. Well,
17  money counters in the residence here, we're dealing with a person
18  that, as set forth in the affidavit, made large cash purchases of
19  vehicles, several thousand-dollar vehicles, tens of thousands of
20  dollars of vehicles, in cash.

21    And the money counters constitute evidence that there's large
22  amounts of cash in that residence and, thus, constitute property
23  that's designed for, intended to use for– used as a means of
24  committing violations, at a minimum, as money laundering with
25  regard to this. And there are allegations of significant money

1  laundering set forth in the affidavit.  So the seizure of the money

2  counters was completely appropriate under the search warrant.

3    So I would submit, your Honor, that, if you look at the totality

4  of the circumstances, both of the affidavit and the search warrant,

5  that any of the items– all of the items seized were properly seized

6  pursuant to the warrant; that the affidavit and the warrant clearly

7  set forth probable cause.

8    And even if you were to find that there were items seized that

9  were not listed in the warrant, the remedy for that is not

10  suppression of the entire warrant, and that's well-settled in the

11  Sixth Circuit.

12    THE COURT:  Well, the money counters, I mean, just

13  took me surprise here. I mean, weren't any reference to money

14  counters until you just made it.  What are we talking about?  I don't

15  have enough money to count, so what is a money counter?

16    MS. PLOWELL:  Yes. They are machines that count

17  large amounts of cash, like a table-top machine, your Honor, and

18  you can put bulk cash in it.

19    THE COURT:  Like a bank would have?

20    MS. PLOWELL:  Like a bank would have, indeed, your

21  Honor, like a bank would have, indeed.

22    THE COURT:  Okay.  And, Mr. Eldridge, I'm not

23  speaking for you, Mr. Eldridge.

24    MR. ELDRIDGE:  I did not raise that issue, your

25  Honor.

1          MS. PLOWELL:    Was in the papers, so I was just

2     responding to everything in the papers.

3          THE COURT:   Well, he's not raising the issue.

4          MS. PLOWELL:    Then it's done and that's resolved.

5     All right.  Unless your Honor has any further questions, I'll rely on

6     my papers.

7          THE COURT:   I don't, Ms. Plowell.  Thank you.

8          MS. PLOWELL:    Thank you.

9          THE COURT:   Mr. Eldridge, anything?

10         MR. ELDRIDGE:    Very briefly.  Ultimately, your

11    Honor, on the <u>Franks</u> issue, we were not able to develop that, and I

12    should have told the Court on the front end that we are not pushing

13    far with that issue.

14         The only thing I would say, in response to Ms. Plowell's

15    argument is, we certainly appreciate her informing us as to what

16    the affiant found in the trash, but what we're stuck with is the four

17    corners of the affidavit, what the affidavit says, not what she says

18    it now says.  And that's the only response I have. Thank you.

19         THE COURT:   All right.  That brings us to Mr.

20    Reynolds' second motion to suppress, which is, of course, our trash

21    can.  Anything else that needs to be said about it?

22         MR. ELDRIDGE:    May it please the Court, the reason I

23    raised that is that we don't know when or where this supposedly

24    occurred, we don't know how it was taken. All we're told is it was

25    a trash can.

1      What we would like to do, your Honor, if we could, is have a

2  little testimony on that so we'll know what we're dealing with and

3  the Court will know what we're dealing with.

4          THE COURT:   What do you say to that, Ms. Plowell?

5          MS. PLOWELL:    Well, I would say that's not the rule,

6  your Honor.  You have to come up with some contested issues of

7  fact in order to get a hearing.  Here they don't allege any facts

8  whatsoever.

9      And the facts that they– the little facts that they do allege are

10  contrary to what the well-established law coming from the

11  Supreme Court in <u>California vs. Greenwood</u> sets forth.  We're

12  allowed to take trash.  You don't have an expectation of privacy in

13  items seized from the trash.

14      Because you put the trash out with the expectation that

15  someone's going to take it.  There should be no evidentiary hearing

16  on it.

17          THE COURT:   Well, with that I agree.  But the trash,

18  contents of the trash, the heat-sealed plastic in the shape of a brick

19  of cocaine and the coffee grounds and whatnot, is a portion, albeit

20  a small one, of your affidavit and the search warrant.

21      That, however, was seized without a warrant, no dispute as to

22  that.  We all know that you cannot have a reasonable expectation of

23  privacy in trash left at the curb; and therein, as I just said, is my

24  concern.

25      I would rather err on the side of caution and at least have

1   some proof that that's where the trash can was. Right now all I've

2   got is the Government's recitation in its response. Since that was

3   seized without a warrant, the burden is upon the Government– is it

4   not– to show that it was properly seized?

5          MS. PLOWELL:   Absolutely. But, see, your Honor,

6   I'm not where you are yet. Where I'm at, the fact is, there's a

7   problem in this part of our district that lawyers put forth no facts

8   whatsoever and they come in and demand an evidentiary hearing.

9          What we're doing really is having little examinations before

10  trial, like little depositions of the witnesses, and it's just– it's a

11  bad practice. And the Sixth Circuit says that they're supposed to

12  put forth contested issues of fact.

13         Here they've put one sentence that evidence was unlawfully

14  obtained. The Government steps forth, okay, the evidence was

15  lawfully obtained. What would be appropriate is first to have set

16  forth why they believe the evidence was unlawfully obtained.

17         But even then, when you see the Government's recitation of

18  facts, to have some form of an objection; not simply, well, let me

19  hear it from the witness so I can get a free examination of the

20  witness prior to trial.

21         And that's what's happening, and the Sixth Circuit says, your

22  Honor– and I'm confident that this is the rule– is that they have to

23  put forth contested issues of facts in order to get an evidentiary

24  hearing.

25         What we're having here is a fishing expedition. We're doing

1    it completely backwards. It's let me hear what the Government's

2    proof is, then once I hear what the Government's proof is, let me

3    decide whether there is the basis for a motion to suppress, and

4    that's what we have here.

5           I think, your Honor, the issue of the fact that we've recovered

6    the trash and that we put that in our affidavit, is completely

7    separate from that. Because what we don't get to do is have an

8    evidentiary hearing on little bits and pieces of evidence and facts

9    that are on the affidavit.

10          We don't get to do that. Simply, we look at the four corners

11   of the affidavit, and that's the– we don't get to go behind and have

12   an evidentiary hearing of it.

13              THE COURT:   Let me ask you, take this scenario, that

14   an officer searches the trash and finds not heat-sealed plastic in the

15   shape of a brick of cocaine, so forth and so on, but actually finds

16   cocaine residue; or you've got the world's dumbest drug dealer, he

17   accidentally throws out a brick of cocaine.

18          You find that, it's seized, and it is that cocaine or the residue

19   thereof that forms the basis of the Government's prosecution,

20   warrantless seizure. And the Defendant files a motion to suppress,

21   saying you had no warrant, it is presumptively an improper seizure,

22   illegal seizure? Is the Government at that point obligated to show,

23   well, it was a warrantless seizure, but you had no reasonable

24   expectation of privacy; because, yada, yada, yada?

25              MS. PLOWELL:   I think if the Government puts that

1   argument forth in its pleadings and the Defendant doesn't

2   otherwise object to it or say, no, in fact, it was here, this is our

3   position, that the trash was recovered from inside the house, which

4   they haven't set forth, then your Honor can look at the pleadings

5   and make a determination based solely on the pleadings.

6          THE COURT:   I'm going to ask you a question

7   premised on the way "we," meaning the judiciary, looks at it.

8          MS. PLOWELL:    All right.

9          THE COURT:   Is that principle, in your opinion,

10  enough to justify the potential of the issue being raised in the Sixth

11  Circuit and a reversal on that when it all could have been headed

12  off at the pass by five minutes worth of testimony?

13         MS. PLOWELL:   I say the cases that I cited in my

14  papers say the Sixth Circuit is going to be okay with it. Because

15  what the Sixth Circuit wants, your Honor, is, wants the parties to

16  make proper pleadings.

17      It's not a good use of this Court's time to have these random

18  evidentiary hearings based on no showing from the defense that

19  there was something, in fact, inappropriate done. Because what

20  they said is, we don't know. "We don't know" is not we did wrong.

21         THE COURT:   Well, as far as the expenditure of time,

22  you and I and our little colloquy could have already expended more

23  time than the testimony would have taken. Because, you know, all I

24  need to hear, yeah, this garbage can was out at the curb, and that

25  would have been the end of it.

1    But I realize you're speaking as to a matter of principle. Once

2  again, we all know that, in the profession, lawyers who litigate on

3  principle–

4    MS. PLOWELL:   Which is why I have a lot of

5  evidentiary hearings.

6    THE COURT:   –is it worth the risk?

7    MS. PLOWELL:   I have a lot of evidentiary hearings,

8  even though I keep advancing this position, so I am prepared to go

9  forward with my witness, your Honor.

10    THE COURT:   Well, I can limit it.  This will be a rifle,

11  not a shotgun, Mr. Eldridge.  And the issue is– you've got no

12  reasonable expectation of privacy, and the law is clear on that, on a

13  trash can left out at the curb. Does anyone disagree with that

14  statement?

15    MS. PLOWELL:   No, your Honor.

16    THE COURT:   So let's hear that.  That's going to be the

17  limit of it.

18    MS. PLOWELL:   Thank you.

19    THE COURT:   That's it. I'm not particularly, not

20  particularly, not generally, I have no interest in anything else

21  except that focused issue that establishes where the trash can was.

22    MS. PLOWELL:   United States is calling Agent

23  Danielle Barto, B-a-r-to.

24    THE COURT:   B-a-r-t-o, Danielle?

25    MS. PLOWELL:   Yes, your Honor.

1          COURTROOM DEPUTY:    Raise your right hand,

2    please. Do you solemnly swear or affirm that the testimony that

3    you're about to give in this matter now before this court will be the

4    truth, the whole truth and nothing but the truth, so help you God?

5          MS. BARTO:   I do.

6                    **DIRECT EXAMINATION**

7    by Ms. Plowell:

8    Q.    Agent, please give your name and your occupation for the

9    Court.

10   A.    Danielle Barto. I'm a special agent with the Internal Revenue

11   Service, criminal investigation.

12   Q.    As part of your duties as a special agent in the IRS-CID, did

13   you have the occasion to assist in the criminal investigation of

14   Donald Reynolds in the fall of 2007?

15   A.    I did.

16   Q.    Tell the Court what you did to assist in the investigation.

17   A.    I assisted in many aspects of the investigation, but one of the

18   aspects that I participated in was collecting trash from the

19   residence of Mr. Reynolds.

20   Q.    And what specifically did you collect the trash from?

21   A.    I collected it from the trash vendor, after he collected it from

22   Mr. Reynold's residence.

23   Q.    Is that the residence on Alameda in Knoxville?

24   A.    Yes.

25          THE COURT:   You got the trash from the trash man?

1          THE WITNESS:    From the trash man, yes, sir.

2          THE COURT:   Cross-examine.

3   By Mr. Eldridge:

4   Q.    Ms. Barto, are you telling us that you got– what did you

5   obtain from the trash man?

6   A.    The trash man collected the trash from the residence located

7   on Alameda and delivered it to me up the street.  He handed me the

8   trash bags that were collected from the residence.

9   Q.    Was it a singular trash bag?

10  A.    On occasion it was one bag; on occasion it was more than one

11  bag.

12  Q.    So am I to understand that you had a prior conversation with

13  the trash collector and asked him to pick up trash for you?

14  A.    Yes, sir.

15  Q.    And did you point out to him which trash receptacle you

16  wanted it from?

17  A.    The initial contact I had with the trash– trash man, I told him

18  the address and I described the vehicle that was in the driveway.

19  Q.    What was the man's name?

20  A.    I do not know.

21  Q.    Do you know where Mr. Reynolds' house is?

22  A.    Yes, sir.

23  Q.    And you know there's a driveway on the left side of the

24  house?

25  A.    Correct.

1    Q.    And you know that there is a house to the left of him?

2    A.    Yes, sir.

3    Q.    And there is a driveway to the right side of that house?

4    A.    Yes, sir.

5    Q.    Which puts both driveways in fair proximity to one another,

6    doesn't it?

7    A.    Yes, sir.

8              THE COURT:   Now, I think we've ranged into another

9    issue here about whether or not they got the right trash.  You can

10   take that up at trial.  The issue here is the seizure of the trash vis-a-

11   vis the probable cause in the warrant, so the expectation issue,

12   expectation of privacy issue, is the only issue we've got that's of

13   any interest to me at all.

14             So have you got any more questions about her–

15   Q.    On how many occasions did you retrieve– did you ask for the

16   cooperation of this employee of the city or county?

17   A.    I don't have a specific number.  I would average over a dozen.

18   Q.    Over a period of time?

19   A.    Yes, sir.

20   Q.    Did you see that employee garbage collector actually take that

21   particular bag out of a particular can?

22   A.    No, sir.

23             MS. PLOWELL:   Objection, your Honor.

24             THE COURT:  Sustained.  That's for trial, Mr.

25   Eldridge.  If you want to grill her on that, I'm sure Judge Varlan

1   will let you have at it.

2   Q.    Did you see where the trash can was?

3          MS. PLOWELL:  Continue to object, your Honor.

4          THE COURT:  Yeah, that's all, that's as far as we're

5   going, Mr. Eldridge.  We've got how she seized the trash can.  She

6   didn't crawl in through his kitchen window and take it out from

7   under the sink; she got it from the trash man.

8          MR. ELDRIDGE:  But we don't know where the trash

9   man got it.

10         THE COURT:  Well, that's got nothing to do with the

11  issue of expectation of privacy.

12         MR. ELDRIDGE:  Very well, your Honor.

13         THE COURT:  Thank you, agent.

14      (Witness excused.)

15         THE COURT:  Okay.  Which brings us to our Daubert

16  matter regarding the ion spectrometer.

17         MS. PLOWELL:  Your Honor, I have Dr. Hacene

18  Boudries here today to testify about the technology.  I would like

19  to give just a very brief opening, if I could.

20         THE COURT:  Okay.  The background of this is that the

21  plastic wrapping was subjected to this ion scan, and it detected

22  cocaine residue?

23         MS. PLOWELL:  Yes. Then I no longer need to give an

24  opening.  I was just going to explain that for the Court.

25         THE COURT:  I didn't mean to steal your thunder.

1    What is the doctor's name?

2                  MS. PLOWELL:   Dr. Hacene Boudries, H-a-c–

3                  THE COURT:  H-a-c–

4                  MS. PLOWELL:   –e-n-e.  And then it's Boudries, B-o-

5    u-d-r-i-e-s.

6                  THE COURT:  B-o-u–

7                  MS. PLOWELL:   –d– as in dog– r-i-e-s.

8                  COURTROOM DEPUTY:    Would you please raise

9    your right hand? Do you solemnly swear or affirm that the

10   testimony that you are about to give in this matter now before this

11   court will be the truth, the whole truth, and nothing but the truth,

12   so help you God?

13                 DR. BOUDRIES:  Yes.

14                 COURTROOM DEPUTY:    Please be seated.

15                 THE COURT:  Tired of spelling your name?

16                 THE WITNESS:   Yes.

17                          **DIRECT EXAMINATION**

18   By Ms. Plowell:

19   Q.    Good morning, Dr. Boudries.  Please give your name and your

20   occupation for the Court.

21   A.    My name is Hacene Boudries.  I am R&D manager at GE

22   Security. I am responsible for ion mobility spectrometry and

23   detection at GE Security.

24   Q.    And R&D is research and development?

25   A.    Yes, R&D is research and development, yes.

1   Q.    How long have you been so employed?

2   A.    Four years–

3            MR. ELDRIDGE:   If I might interrupt, I'm having a

4   hard time hearing.

5            THE WITNESS:    Okay.  Can you hear me now?

6            MR. ELDRIDGE:    That's wonderful.  Thank you.

7   A.    Yes. For four years.  I started in 2005.

8   Q.    And what did you do prior to that?

9   A.    Prior that I was working at MIT as a research scientist and

10  also Aerodyne Research–

11           (Court reporter asked witness to repeat.)

12  A.    –research scientist, and also Aerodyne, Aerodyne as a senior

13  scientist.

14           THE COURT:   And your doctorate is in what?

15           THE WITNESS:    Analytical chemistry.

16  Q.    I was just going to ask you to give your full educational

17  background for the Court, if you would.

18  A.    Yes. I did my Master and Ph.D. in analytical chemistry at

19  University of Paris VII in France.

20           THE COURT:   University of?

21           THE WITNESS:    Paris Seven, that's the name of the

22  university.

23  A.    (Continuing) So I got my Ph.D. there in atmospheric

24  chemistry, mainly focusing on analytic techniques such as gas

25  chromatography, mass spectrometry.  After that I was appointed as

1    professor assistant, and I was teaching all kind of chemistry

2    courses for almost two years.

3            And then after that I decided to do a post-doc, post doctorate,

4    in Canada, so I went to Canada. I spent almost three years and a

5    half at Atmospheric Environment Service in Canada, also doing

6    research using different kind of analytical techniques, such as GC,

7    which is gas chromatography, mass spectrometry, for the

8    detections of hydrocarbons in the air.

9    Q.    Can you tell the Court what a hydrocarbon is, please?

10   A.    Hydrocarbons is basically organic molecules that has numbers

11   of carbons, hydrogens, sometimes oxygens. So it could be

12   benzene, toluene, methanol, ethanol, almost everything that a car is

13   emitting in the air, aircraft engine, trucks, things like that.

14           So we'll try to characterize all that emission using different

15   kinds of analytical tools such as GC and GCMS.

16   Q.    Now, have you published any articles?

17   A.    Yeah. I have published many articles when I was a research

18   scientist. Also when I joined Aerodyne and MIT, I published a lot

19   in aerosol science. Basically I was focusing on characterizing the

20   chemical and physical composition of aerosols in the air.

21   Q.    And have you written any articles on ion trap mobility

22   spectrometry?

23   A.     We have one that is going to be published very soon.

24   Because we work for GE, sometimes it's extremely difficult to

25   publish. GE does not like to publish the science so we can keep all

1   the— basically secret also all the advance of our technique, not

2   published.

3        But we have one paper that is going to be published very soon.

4   We have a presentation.  In fact, I was down just couple days ago at

5   ITRAP-O.E.(phonetic) in Boston.  And we sometimes gave

6   presentations at the IMS conference, which is ion mobility

7   spectrometry conference. There is one organized every year, and

8   we try to every year at least present something there.

9   Q.    Okay.  Can you explain for the Court what is ion trap mobility

10  spectrometry?

11  A.    I think maybe if I can go through the slides, I have prepared

12  some slides.  I can go very quickly through that or I can just give

13  you very quickly definition of ion mobility spectrometry, and then

14  we can go into the detail, if you are interested.

15  Q.    Why don't we start with just the first definition, then we'll go

16  through the slides in a minute?

17  A.    Okay.  So ion mobility spectrometry refers to a technique that

18  measures the speed of molecules in a field, an electrical field.

19  Basically, what we try to do is, you know your start position, you

20  know your end position, you have the molecule and you try to

21  measure how long it will take that molecule to fly from Point A to

22  Point B. That's basically ion mobility spectrometry.

23  Q.    Does the substance that you are testing differ, does it differ

24  based on the size of the molecule?

25  A.    Basically, they are separated based on the size of the

1    molecule, yeah.  The smallest one will arrive first to their target or

2    to their detector and the heaviest one will arrive later on.

3    Q.    Does every molecule travel at a different speed based on the

4    substance?

5    A.    Yes. If they have different size, they travel at different

6    speeds.

7    Q.    What is that called, the travel?

8    A.    The time of flight, that's what we define.  There is two

9    definitions; we call it the time of flight or the drift time.  Basically,

10   that's what you will see on our instrument, is we display the drift

11   time for the molecule.  It means we look at if there is a signal at a

12   certain position on a certain time, and then we correlate that time to

13   a specific molecule.

14          This is why we do a calibration.  So you calibrate your system

15   with known molecules, and then you characterize your time of

16   flight for that specific molecules.  And then if you take a sample

17   and you see a signal at that specific time you can correlate that

18   signal to a presence of that molecule.

19              THE COURT:   Doctor, you need to wait on me.

20              THE WITNESS:    Okay.

21              THE COURT:   You're sure not dealing with a chemist

22   here.

23              THE WITNESS:    All right.

24              THE COURT:   And please do not agree with me for the

25   sake of agreeing with me.

1          THE WITNESS:   Okay.

2          THE COURT:   I'm saying this aloud to make sure I

3    understand.  If I misunderstand, you need to correct me; all right?

4          THE WITNESS:   Yes, sir.

5          THE COURT:   But this technique, the ion trap mobility

6    spectrometry, is based on the fact that small molecules move more

7    quickly than heavier molecules?

8          THE WITNESS:   Yes. Yes, sir.

9          THE COURT:   The device measures the speed of these

10   molecules, whatever they may be?

11         THE WITNESS:   Yes.

12         THE COURT:   Thirdly, you calibrate the device with

13   known or identified molecules?

14         THE WITNESS:   Yes, sir.

15         THE COURT:   You may be getting into this, but I just

16   need to know now.  Every molecule, whatever it is, hydrogen,

17   water, uranium, whatever, all are unique?

18         THE WITNESS:   Yes.

19         THE COURT:   Do any of them have rates of travel so

20   fast– or, excuse me– so similar that you could confuse the two

21   molecules?

22         THE WITNESS:   Okay.  There is a probability that

23   some molecule will give you the same time of flight as the one you

24   are trying to calibrate.  So there is tens of millions of molecule in

25   the air, basically, or molecules that someone can make.  So does all

1   of them have different time of flight? No. Maybe some of them

2   have exactly the same time of flight or very close time of flight.

3       However, what we do in our technique, there is another thing

4   that we add to our system we call a dopant chemistry.

5           THE COURT:   What kind of chemistry?

6           THE WITNESS:    Dopant. Dopant is just another

7   chemical that is inserted in a device; it's ammonia or

8   dichloromethane. What ammonia and dichloromethane do in our

9   system is basically suppress everything that is not of our interest.

10      For instance, if you want to target narcotics or explosives, we

11  have selected these two chemicals; that if you have, for instance,

12  all your molecules, such as benzene, toluene, et cetera, all these

13  molecules would be suppressed. So the only one we are going to

14  see ionize and fly down into our drift tube are the ones of interest

15  to us.

16      And after we do that, we go in the field and we take thousands

17  of samples just to make sure, and exactly that's the point to your

18  question, just to make sure that we don't have another sample that

19  can trigger similar that we think it's related to a molecule of

20  interest. That's what we call a false alarm.

21      That's what we do. When the device is calibrated and

22  characterized, it's taken to a field where several thousands of

23  sample are taken to make sure that there is nothing else is going to

24  generate what we call false alarms. And we do that to minimize

25  that false alarm below two per cent or even lower than that.

1          THE COURT:   Okay.  In this case, you have calibrated

2     the device for cocaine and other illegal drugs?

3          THE WITNESS:   Yes.

4          THE COURT:   You have used the two, ammonia–

5          THE WITNESS:   Ammonia and dichloromethane.

6          THE COURT:   –dichloromethane to suppress any other

7     molecule that has a speed similar to that of a cocaine molecule?

8          THE WITNESS:   Yes.

9          THE COURT:   And you have field-tested this how many

10    occasions to ascertain that you're not getting any false positives?

11         THE WITNESS:   Basically, we try to deliver product

12    that has less than two per cent false alarm.  So if you take, for

13    instance, a hundred samples, you may have one or two samples that

14    can give you a false alarm, you think it's– you are detecting

15    something, but in reality it's just a false alarm.

16         So we try to design the device– there is other priorities that

17    we have to take into account– to make sure that when you are in the

18    field, when you take sample from any surfaces or in the air, you

19    minimize your false alarms.  And we try to get below two per cent,

20    and we have done all our field test where we were even below point

21    five per cent.

22         THE COURT:   Below point five?

23         THE WITNESS:   Yes, point five per cent.

24    By Ms. Plowell (continued):

25    Q.    And just if you could explain for the judge, the false alarms,

1    tell the judge, if you could, what does that include?

2    A.    So the false alarms, there is the false positives and false

3    negative.  Just very quickly, what's the difference between the two,

4    a false positive is, you have your sample of interest. For instance,

5    you are trying to analyze TNT, and then you pass the trap into your

6    device and then the device tells you there is nothing.

7          And a false negative is exactly the opposite; you don't have

8    anything in your sample, and the instrument would tell you, oh,

9    you have something. And thus we try to minimize these false

10   positives and false negatives below a reasonable number, which is

11   two per cent.

12   Q.    So the two per cent error rate includes both false negative and

13   false positives?

14   A.    Yes, false positive.  And sometimes it's– also it's called

15   nuisance alarm.

16   Q.    Explain to the Court what the nuisance alarm is.

17   A.    Basically, is just to– word used to describe false alarm.  Some

18   calls it false alarm; I like to call it false alarm.

19   Q.    Now, the product that is used for the ion scan, tell the Court

20   what that is that you all use.

21   A.    So can you repeat your own question?

22   Q.    What's the name of the product that you use to do the ion

23   scan?

24   A.    We use ion trap mobility spectrometry.  It stands for ion.

25   Basically, we make ions, we trap them into a field, and then we put

1    them into an electrical field and we observe the speed for these

2    ions to fly from one positions to another. That's the ion trap

3    mobility spectrometry.

4    Q.    And what's GE's product for that?

5    A.    So we have hand-held and desk tops and portal products. All

6    of them–

7          (Court reporter asked witness to repeat.)

8    A.    Hand-held, desk tops, and also portals, and all of them use the

9    same detector, ion trap mobility spectrometry. The only difference

10   is the sampling configurations. Every one has a different sampling

11   configuration. But when the sample is introduced into the

12   detector, after that, everything is the same. And all are basically

13   right now configured for the detections of explosives and

14   narcotics.

15   Q.    Okay. And are you familiar with the Itemiser-3?

16   A.    Yes, I am.

17   Q.    And tell the Court what the Itemiser-3 is, please.

18   A.    Itemiser-3 is a desk top device that's basically used to analyze

19   substances that are present on a trap. Basically, the sample

20   introduction consists of taking a trap– I think I have a picture; I

21   can show it later on.

22          You swab your trap on some surfaces, and then you insert the

23   trap into the device. After seven seconds of analysis time, you will

24   get the results of what was in the trap.

25   Q.    Okay. And is that the product that was used here in this case,

1    the Itemiser-3?

2    A.    Yes, it is.

3    Q.    And we've got your PowerPoint presentation. Why don't we

4    just start going through it to make it quite clear?

5              MS. PLOWELL:   Judge, I've got a copy of the– a

6    printed out copy, of the PowerPoint presentation that I'd like to

7    introduce as evidence so that you may review it in the future.

8              (Plaintiff's Exhibit No. 1 received.)

9    Q.    Okay. Tell the Court– we're looking at kind of four prongs

10   here. And has the theory of, ion mobility theory, has that been

11   tested?

12   A.    Yes. I can go, in fact, through all of this question. This

13   PowerPoint, this is basically the summary of the presentation of

14   the IMS technology. At first has the theory or technique has been

15   tested. If you go, please, to the next slide.

16             So the instrument, has the theory and technique been tested,

17   so the answer is, the instrument evaluation

18   acceptance/certification. Basically, our devices, when they are

19   built, before we deploy them to the field, they have go through a

20   very thorough certification process. So, basically, we give our

21   devices to, for instance, TSA here in the United States, STAC. in

22   France, ISA in Israel.

23             And then we give them the device, the manual, and they do

24   their own protocol for evaluation of their system. Basically, they

25   have their own criterias for sampling and detection and

1  performance, and the device is certified only if it meets their

2  criteria.

3          And as of now we have the Itemiser-2 that is certified, we

4  have the Itemiser-3DX– it just passed the certification– we have

5  the Itemiser-3 that is used in this case certified, ENAC, Italy, and

6  we have the Itemiser-3DX that passed the lab certification in

7  France and also Israel.

8          We also provide our devices to different agencies. They do

9  try– or evaluations. So every agency sometimes have their own, I

10 would say, their own conditions, how they want to run the device.

11 They want to check and make sure that the instruments meet their

12 requirements.

13         So we give them the device and they test it. That's basically

14 they test the instrument that performs for the detections of

15 narcotics and explosives and meet their criteria.

16 Q.    And where is this technology typically used?

17 A.    Basically, it is used by U.S. Army, by TSA, Coast Guard,

18 Customs, laboratories, police, basically almost everyone who are

19 trying to look for the presence of explosives as well as narcotics.

20 Q.    Okay. Now, the science behind this or the physics behind it,

21 is it similar to the gas chromatography that's used in labs to test for

22 the presence of narcotics?

23 A.    It's not very similar. The main difference is that ion mobility

24 spectrometry is a very simple technique, so it can be– you can– it's

25 basically a mass spectrometer that can operate at atmospheric

1    pressure that will simplify the design. It can make the operation of

2    the device very simple.

3         Also, it's a very small device. You can deploy sometimes in

4    the field. That's the main difference. And also it can give you

5    more or less the same response as GCMS. The only thing that we

6    don't have compared to GCMS is the quantitative response.

7         In GCMS you can quantify what you have in your sample. In

8    IMS right now, the results of the response is just yes or no; it

9    detected or it didn't detect.

10   Q.    And the GCMS is the gas mass spectrometry–

11   A.    Yes. It's gas chromatography/mass spectrometry.

12   Q.    Okay. Is that's what's used typically in, say, police

13   laboratories and forensic laboratories?

14   A.    I guess so. I'm not familiar with that, but yes.

15   Q.    And the difference between the GC is that if you had a

16   substance that you were testing for the presence of cocaine, in the

17   GCMS it can tell you this substance is 60 per cent cocaine, whereas

18   the IMS simply tells you this substance is cocaine?

19   A.    Yes.

20             MR. ELDRIDGE:   Object to leading, your Honor.

21             THE COURT:  Sustained. But it's inconsequential.

22   The point is, that the ion device simply will not quantitate, correct?

23             THE WITNESS:   Yes. Yes, your Honor.

24   Q.    Okay.  Now, tell me this. Are there any publications

25   pertaining to this ion, ITMS or the IMS technology?

1    A.    Yes. Can you please go to the next?  Yeah, "Peer Review and

2    Publication."  There is a lot of paper that I've published using ion

3    mobility spectrometry.  There is also a lot of laboratories here in

4    the United States and also in Europe working on ion mobility

5    spectrometry.  We have corroborations with some of the

6    universities.

7         In fact, the paper we are publishing very recently was a joint

8    paper with the University of– Washington State University.

9    Sorry.  There is also a international IMS conference; it's held every

10   year, one year in United States, the next year is somewhere the rest

11   of the world, and sometimes we take–

12   Q.    Let me ask you this about the conference.

13   A.    Yes.

14   Q.    Is that conference well-attended by people in the field?

15   A.    Yes, yes.

16   Q.    And have you personally attended these, the conferences?

17   A.    Yes, I did. I attended last year; it was in Ottawa.  This year

18   it's in Switzerland, going there. The next year it's going to be in

19   Boston, and we would be organizing the conference.

20   Q.    Okay.  And we have here on the PowerPoint, just for the

21   record, a number of journals; the International Journal of Ion

22   Mobility Spectrometry, you talked about the International Society

23   of IMS conference.  And analytical chemistry as a field, is that

24   something where the IMS is also discussed or is that a journal?

25   A.    Yes, analytical chemistry is really a field.  There is also a

1  journal called Analytical Chemistry. You can find papers that are

2  published there that relates also to ion mobility spectrometry. But

3  the two major one where you can find basically knowledge about

4  ion mobility spectrometry are the two first one, International

5  Journal of IMS and also International Society of IMS. That's

6  basically the two major papers or journals.

7  Q.      Okay. And we talked a little bit about the error rate for the

8  ion scan machine and the nuisance alarm and the alarm rate. Tell

9  me, is the ion scan generally accepted within the scientific

10  community?

11  A.      Yes, it is, it is accepted. In fact, in some applications, if it

12  does not meet a certain criteria, the instrument is not deployed in

13  the field. So we always try to make sure that we meet a very good

14  detection performance as well as a false alarm.

15      False alarm is a very important parameters that any user has to

16  characterize and find out about the instrument, because you want to

17  minimize that as much as you can. And we try always to basically

18  make it close to zero.

19  Q.      And has the ion scan technology been subjected to review by

20  other people in your field? Has it been critically analyzed?

21  A.      Yes, absolutely. The ion mobility spectrometry, in fact, has

22  been analyzed by, especially if you look at, for instance, just TSA,

23  TSA, although they were only focused on explosives. But we work

24  with also other agencies to try to evaluate narcotics.

25      We have two trial, for instance, the next maybe in June or

1   July, where some organizations can meet also in Europe.  They

2   want to characterize all of our device, check basically, if our

3   instruments meet their criteria for narcotics detection.

4   Q.    And say, with the TSA and airports, how many samples, for

5   example, would they take?

6   A.    Oh, TSA, I don't know, hundreds of thousands of samples.

7   They are using our instrument maybe for more than ten years.  They

8   are deployed at many checkpoints in airports.  They do have the

9   record of basically– I don't know if they record the samples, but

10  every alarm is recorded and stored.  But it's tens of thousands of

11  samples.  I can't tell you the number.

12  Q.    Okay.  And it's used typically.  When we talk about the TSA,

13  just so that we can understand something that we've all used, is it

14  the swab that they use over your luggage?

15  A.    Yes, it's the swab they use.  Yes, they have basically either

16  paper traps or Teflon traps, and they take the swab and they just

17  swab it through any surface, luggage.  And then they insert the

18  swab into the device and a few second later they get the results.

19  Q.    Now, if you could explain for the Court how the machine is

20  actually used, please.

21  A.    Okay.  If you can click again, you go to next, and then next,

22  and next, next– go back.  Sorry.  Okay.  So this is the schematic of

23  our detector, which is the ion trap mobility spectrometry.  You will

24  see here on the left hand side it says, "Inlet/sampling system."  So

25  this is where basically you insert your trap.

1          So the trap is inserted into this region, and this region is kept

2    at a very high temperature. When you insert your trap–

3               MR. ELDRIDGE:   I'm sorry. What?

4               MS. PLOWELL:   Temperature.

5    A.    Temperature.  And when the trap is inserted into what we call

6    the desorber, we vaporize all the molecules that are on the trap.

7    Once evaporization process is complete, the molecules are then

8    transferred into the ionization region, and you can see here what is

9    the ionization region.

10   Q.    Is that here, this second–

11   A.    Yes. There is a box called "Ionization Region." Okay.  So

12   basically what we do there, we ionize the molecules, so the

13   molecules get into that region.  There is a radioactive source that

14   ionize the molecules.  Basically, what we do, we charge the

15   molecules either positively or negatively.  For the narcotics the

16   molecule are usually charged positively.

17         And then when the molecules are charged, we release them

18   into the drift tube, and then you can see the drift tube, what we call

19   here in the schematic, ionization– sorry– the drift region.  So the

20   molecule flies from just after the ionization chamber to the end of

21   the drift region.

22         And we know that equal zero, is because we have to release

23   this molecule into our drift region.  Basically, how we do that, you

24   just pulse, you do electrical pulse on the ions, and then the

25   molecules will fly into the inside– sorry– the drift region, and

1    when they reach the ion collector, they produce an electrical

2    current, and that's what you see.

3         There is a display on the bottom of the screen, yes, you're

4    right. That's what you see, basically. When the molecule hit, it's a

5    Faraday cup; it's basically just a electrical plate, and when

6    molecule that are charged with different current, they create a

7    signal, and that's what you see on the bottom of the display.

8         So we know that equal zero, we know when they arrive to the

9    collector. The time is displayed in the X-axis, and that's

10   basically– and then if the molecule would show up to a time that

11   we think is specific to a certain molecule, then we can attribute

12   that's similar to the presence of certain molecule.

13   Q.   Okay. And when you say the presence of certain molecule,

14   for us that is the substance that we're looking for, the drug or the

15   explosives?

16   A.   Yes, yes. The system has been calibrated or characterized for

17   a number of explosives and narcotics. For the device that has been

18   used, I've looked at, there is about nine narcotics that are basically

19   calibrated and also used in this device.

20   Q.   Okay. Now, if you would explain for the Court, does this

21   happen automatically when you put the trap in or is there

22   something that the operator has to do to get this process to work?

23   A.   Everything is happening automatically, so the operator, the

24   only thing they need to do, is, basically, insert the trap into the

25   desorber. The trigger button is automatic, all the rest, the analysis

1    is automatic, the display of the results is automatic, everything.

2         So the operator has basically just to insert the trap.

3    Depending on the results, if they have alarm or not, they have to

4    clear sometimes the system. So they need just to push a button to

5    clear the alarm; or if there is no alarm, the system is ready for the

6    next analysis.

7    Q.   Can you explain for the Court what you mean by an alarm?

8    A.   Alarm is basically when we think a substance is detected, a

9    substance that is in our substances list. So if there is a substance

10   that is detected and it's above certain threshold and we think it's

11   there, there is an alarm or a warning.

12        So basically you have a red warning that tells you that

13   something has been detected.

14   Q.   And, Dr. Boudries, if you could explain for the Court,

15   specifically with regard to the cocaine and the ITMS, what is the

16   threshold, the minimum threshold?

17   A.   This is– goes back to the previous question. So when we

18   define the detection for certain substance, if we take the case of

19   cocaine, for instance, when we go in the field we try to define what

20   is the minimum alarm level to minimize all false alarm.

21        Alarm level is basically a level after which we are a hundred

22   per cent confident that cocaine is detected. That's how we set the

23   alarm level, and they are different from one substance to another.

24   So if we– you have a sample and you try to analyze the sample and

25   then the alarm or the signal is above the alarm level, then we are in

1    the confidence to say, yes, this is cocaine that is detected; and then,

2    of course, the results are displayed in the device.

3         So the alarm level are determined from the field data to give

4    us that confidence that if a substance is detected we can actually

5    view that to exactly that substance and minimize all false alarms.

6    Q.    Okay. And does the operator of the machine have certain

7    protocols that they must follow?

8    A.    There is protocols when the operators, of course, buy the

9    machine from us. We provide the machine with manuals, different

10   kind of trainings. There is different level of operating the

11   machines; there is from a basic to a superusers. But that's

12   basically– every operator has his own mode of operation.

13   Q.    And is the machine designed to protect against operator error?

14   A.    Yes. What we try to do, basically, when you are running the

15   device as an operator, if there is anything that is outside the normal

16   operation of the device. So what do I mean by normal operation of

17   the device? Is basically for every analysis you have to– the system

18   has to be set at certain temperatures, flows, voltages, et cetera.

19        So for every sample we go and check all these parameters. If

20   one of these parameters is outside the optimum range, there is a

21   warning. When the warning is displayed, basically, the instrument

22   cannot be operated until the warning is resolved.

23        So this is how we can minimize that the operator make

24   mistakes or especially around the device when it's not calibrated or

25   it's not at its optimum conditions.

1    Q.    And how, if you can explain for the Court, how does the

2    machine calibrate itself?

3    A.    So calibration is a very important part of running the device.

4    We have recommendations to the operator on how they want to

5    calibrate the device. It's automatically programmed in the system.

6          So, for instance, every eight hours there is a warning to

7    inform the operator that they have to calibrate. If they don't

8    calibrate, they cannot operate the device. And the supervisor can

9    change that to four hours or two hours.

10         But if you have that, so you will get a warning so the

11   instrument has to be calibrated. The calibrated has to be successful

12   before you can go and operate the device.

13   Q.    And if you can explain for the Court, how does the instrument

14   report its results?

15   A.    The instrument, basically, there is different way how you can

16   report the results. When we offer the instrument to our users, we

17   try to give them from a simple report display to a very detailed

18   report. And all that informations is anyhow saved, so even if you

19   decide to display by just green or red, or you want to display times,

20   time of flight, peaks, height, also other information.

21         So the simple display will be basically, if a substance is

22   detected, the instrument will show green– sorry– a red alarm, it

23   says something has been detected. Then you can go, look at

24   exactly what you have, or you can select different mode of

25   displays.

1  Q.     Does the machine tell you what you have or is that something

2  that the operator has to interpret, if you know?

3  A.     It's also programmable. You can select the machine to tell

4  you exactly what you have detected or you can turn that option off.

5  But it's all, all saved into the file, so you can always go back and

6  look at it.

7          Some of the users, they don't want to display the name of the

8  substance for multiple reasons, so we give the options to the users

9  to disable that option if they want to.

10 Q.     And did you have the opportunity to review the results in this

11 case?

12 A.     Yes, I did. I looked at basically all the plasmagrams that were

13 collected.

14 Q.     And explain for the Court what the plasmagram is.

15 A.     Plasmagram, if you look at here on the bottom of the screen,

16 that's the plasmagram. It's basically the results of the analysis. So

17 you have in blue what we call the negative ions, and on the bottom

18 is the positive ions. The positive ions is the region that is used

19 basically for the detection of narcotics. The negative is merely

20 used for the explosives. That's the plasmagram.

21         So what I've done is, I looked at all the plasmagram that were

22 collected. I looked at two things; first, to see if the instrument was

23 clean, if the instrument was calibrated, and if the peaks were really

24 at their position. And so everything seems to me that was operated

25 in the right conditions.

1          MS. PLOWELL:  I have no further questions for this

2    witness.

3          THE COURT:  Doctor, how would a plasmagram look if

4    you were detecting multiple explosives and multiple narcotics?

5    Let's talk narcotics.  If you were picking up cocaine,

6    methamphetamine–

7          THE WITNESS:  MDA?

8          THE COURT:  Yeah, there you go, Ecstasy.  When

9    you've got all that on the single sample, would those different

10   drugs be demonstrated on the plasmagram?

11         THE WITNESS:  Yes. If you look at here, it's more or

12   less the same thing as you can see here on the bottom of the display

13   in red.  So you have– if you have a mixture of narcotics, you will

14   see different peaks in the plasmagrams.  So they are all

15   differentiated.

16       In the plasmagrams, when you print the results, it tells you

17   basically where the positions of every narcotics should show up,

18   and they are all– they all have their own specific windows where

19   the different narcotics will show up.

20       And we have, within that window, we have also errors

21   window, make sure that if the peak shift a little bit it's within that

22   window, and all of them have their own specific time of flight.  So

23   there is a mixture you see multiple peaks in the plasmagrams.

24         THE COURT:  Well, this particular illustration you

25   have three peaks.

1          THE WITNESS:   Yes.

2          THE COURT:   That is demonstrating what?

3          THE WITNESS:    Three peaks, for instance,

4    demonstrating that there is the three different molecules in your

5    system.

6          THE COURT:   Three different molecules that the

7    device was intended to detect?

8          THE WITNESS:    To detect, yes.

9          THE COURT:   So just for purposes of our discussion,

10   these three peaks would demonstrate that it was picking up three

11   molecules of what?

12         THE WITNESS:    Oh, this is, first of all, this is just an

13   illustration.

14         THE COURT:  I understand.

15         THE WITNESS:    Let's assume we have heroin, THC,

16   and cocaine, and I make a mixture that has three narcotics.  So I

17   insert the traps into the detector, what you will see in the

18   plasmagram, you will see three different peaks in the plasmagram.

19   One will show up exactly the time of flight for cocaine, the other

20   one is THC, and the third one has heroin.  So that's what you will

21   see in the plasmagram.

22         THE COURT:   And it is the peak, the height of the peak

23   itself, that is of interest to you?

24         THE WITNESS:    Yes. The peak has to be above a

25   certain threshold, and that will give me confidence that that peak is

1    detectible, that molecule is detected. So there is two things during

2    the analysis that are very important; one is the time of flight. The

3    peak has to show up at a certain time.

4         When the peak is there, it has to be above a certain threshold.

5    So there's two things that are important, the time of flight at first.

6    When we found the peak, we look at what is the peak height or the

7    intensity of the peak, and it has to be above a certain threshold.

8    And it's only when these two conditions are met then would trigger

9    alarm.

10        MS. PLOWELL:   Judge, if I could switch over to the

11   presentation, I can actually show you an actual plasmagram that

12   was used that might be more useful to you.

13        THE COURT:   Okay.

14        MS. PLOWELL:   Do I just press this button?

15   Q.   Okay. Dr. Boudries, do you recognize this?

16   A.   Yes, I do.

17   Q.   And what do you recognize this as?

18   A.   Okay. I can start with the plasmagram in the bottom. This is a

19   typical display of Itemiser-3 plasmagram results. What you will

20   see always on the top is the negative display, and then the bottom is

21   the positive. This is where we look at the– then the narcotics.

22        On the left hand side there is some numbers there. We also

23   display the time position and also the big height corresponding to

24   every time. So the left column is the explosives, and then the

25   column just to the right of it is the narcotics.

1          For every plasmagram that is taken, everything that was used

2     to collect that sample is also stored with the sample.  For instance,

3     the date, the calibration files, the temperature, pressure,

4     calibration offset, the cal. factors.  So these are also parameters

5     that I can go and look and make sure that the instrument was

6     operated in the right condition.

7          So not only the results are displayed, but also all informations

8     about how the instrument was operated are also saved and

9     displayed with every file.

10         And then you can see it here on the right hand side, you see

11    the– sorry– it says notes, file name– every file is saved– the date,

12    the time, the software version, how– the mode of operations.  We

13    have a dual mode, or a negative or positive; and everything else,

14    temperatures, flow are saved.

15         And then if you go a little bit to the right side, so here you see

16    the list of substances that are basically used in our device.  The top

17    ones are the explosives, the bottom ones are narcotics.  The second

18    one, the second column, is the standard location.

19         When we calibrate the device, the software will go

20    automatically to the standard location, look for the presence of a

21    peak.  If it found a peak, it goes to the threshold column, which is

22    basically the last one, and you look.

23         If the intensity of that peak is above a certain value, it is only

24    when it's above the threshold and within that specific time of flight

25    that the alarm is triggered.

1    Q.      And the one that we're looking at, is this a blank trap?

2    A.      If you go back to the– no, this is cocaine. You can see here

3    that cocaine is detected. And if you look at on the left side, it's

4    that there is cocaine-plus, and it gives you the time of flight and

5    also the intensity of the peak.

6            The intensity of the peak here is determined as a ratio between

7    the peak height and also the threshold. It tells you that the cocaine

8    here is 2.5 times higher than the threshold value. By the threshold

9    value, we think that anything below that, we don't attribute that to

10   cocaine.

11   Q.      Okay. Very good. And if you'll look at the first, the top one

12   here, if you can explain that one as well.

13   A.      The top one here, it shows a big signal of cocaine. And what

14   is important, if you compare the top one to the bottom one,– if you

15   just go back to the bottom one, again, little bit more. So if you look

16   at the bottom plasmagrams, you can see cocaine peak, and then

17   there is another peak just before, four milliseconds. That's the

18   dopant peak. That's the ammonia that is used basically to suppress

19   all the other molecules.

20           And the top one, there is only cocaine peak present. Why is

21   the other one has disappeared, because what's happening is when

22   cocaine is injected into the device, cocaine react with the dopant–

23           (Court reporter asked witness to repeat.)

24   A.      The dopant, d-o-p-a-n-t, dopant, and it's ammonia.

25           Basically, when you have high concentrations of narcotics,

they react with dopant. If the concentration is very high, the dopant is depleted, and that's what we see in the first plasmagram, it's completely depleted. So this is why you have high concentrations of cocaine. It means that the top sample has the higher concentrations than the one on the bottom.

MS. PLOWELL: Very good. And, your Honor, I'll offer this as Government's Two.

(Government's Exhibit No. 2 received.)

MS. PLOWELL: Okay. Now I have no further questions.

THE COURT: Why don't we take about a ten-minute break?

MS. PLOWELL: Okay.

(Recess had at 10:41 a.m.; Court reconvened at 10:56 a.m.)

THE COURT: Doctor, one quick question. The name of your device, is it Ioniser or Atomizer?

THE WITNESS: Itemiser, I-t-e-m-e-s-i-e-r (sic), dash-3.

THE COURT: Goodness. I-t-e-m-e-s-e-r?

THE WITNESS: M-i-s-e-r, yes. It's written here on the display on the top left hand side. It's little bit difficult to read, but it's I-t-e-m-i-s-e-r.

THE COURT: The Itemiser-3. All right. Mr. Eldridge?

MR. ELDRIDGE: Thank you, your Honor.

1          CROSS-EXAMINATION

2    by Mr. Eldridge:

3    Q.     Dr. Boudries, if I may, I will tell you that I have in my hand

4    what was introduced as Exhibit Number Two, and I want to ask you

5    some very specific questions about that; okay? I'm over in the left

6    hand, upper left hand corner. Does that look like the upper left

7    hand corner?

8    A.     Yes.

9    Q.     Okay. It would appear there is the name up there in the upper

10   left hand corner, "GE Itemiser-3." Now, that's the machine made

11   by your company?

12   A.     Yes, sir.

13   Q.     Okay. And it says, "Drugs Detected," and then on the left

14   hand side it says, "Substance Cocaine+," and then there's a list of

15   negative– are those negative ion time? Is that what that means?

16   A.     Yes, negative ions. And then on the bottom is time. It tells

17   you the time, the time of flight of every peak that is on the

18   plasmagram on the top side.

19   Q.     Okay.

20   A.     And then the left column is positive ion time, and then the–

21   there is height. So for every time, for every peak that is detected,

22   we display the time in milliseconds and the height of the peak.

23   Q.     And what's confusing to me is, you look over to the graph as

24   it's displayed here, and I don't see but one peak. But yet on the left

25   hand side it says there are many peaks. Can you explain that?

1    A.    I am not sure to understand exactly your question, but–

2    Q.    Okay. Let me ask.

3    A.    Yeah.

4    Q.    I can ask a better question.

5    A.    Yes.

6    Q.    If you look at this information here–

7    A.    Yes.

8    Q.    –is that the information that is here?

9    A.    Yes, sir.

10    Q.    Okay. Now, is this showing cocaine?

11    A.    No. The cocaine would never show up on the top. This is the

12    negative ions. This is all molecules that are charged negatively.

13    Cocaine is a molecule that is charged positively and will show up

14    only on the positive display.

15    Q.    Okay. Only–

16    A.    So the top one–

17    Q.    –only down here?

18    A.    Yes.

19         THE COURT:   Well, just for my edification, what is

20    showing up up there on the negative ion scale?

21         THE WITNESS:    Oh, it could be anything. This is

22    peaks that are– for instance, if you take a sample and then there is

23    dust, sand, oil, sometimes you see the small peaks here. That could

24    be almost anything, background, what we call just a background

25    chemicals that are collected.

1    Because when you collect the trap, when you have a trap and

2  you try to take a sample, so you try to get your sample, but at the

3  same time everything with the sample, such as dust, assuming that

4  you are just sampling from the top of a desk, that also be

5  introduced in the sample. Sometimes you see that in the device.

6  By Mr. Eldridge (continued):

7  Q.    Okay. Now, I'm going to go to the right hand side of the

8  exhibit, see if I can get that all in there, perfect, just barely fit. At

9  the top, on the left, it says, "Notes: Don Reynolds #6," correct?

10  A.    Yes.

11  Q.    I assume that means this is the sixth sample that has been run

12  on Don Reynolds?

13  A.    This one is entered by the operator, so the best person to

14  answer to these questions is the one who entered this. This is not

15  generated automatically by the machine; it is a note that are typed

16  by the person who is taking sample. We offer that option to the

17  users, if they want to write something. So it is going to be always

18  captured when you take a sample.

19  Q.    Okay. Now, and then it has a list of substances for which the

20  machine is testing; am I correct?

21  A.    Yes, you are correct.

22  Q.    Now, is every Itemiser programmed for these particular

23  substances?

24  A.    That is– we have different configurations, depending on

25  software versions. So some users want to have maybe another

1    substance added, some user wants to have one substance removed.

2    So I don't know on the top of my head every software version.

3           Here what you are looking at is a software version 8.15, and

4    on the right hand side is the substances configuration for that

5    specific software version. So you have the top ones are the

6    explosives and the bottom ones are the narcotics.

7    Q.    Okay. And there's– okay. And then, to follow this on out, for

8    example, it says, "TNT," and then it's got standard and calibration,

9    and there seems to be a number there. What is that number?

10   A.    Okay. So this number here, so your first column is the

11   standard location, so this is where–

12   Q.    What?

13   A.    Standard location. This is where we expect to see the peak.

14   The next one is the "Cal" value. "Cal" value, basically, we have

15   two ways to display the results. It can be displayed directly in

16   milliseconds or it can be displayed– sorry– displayed in calibrated

17   unit, and that's basically is just a calculation going from standard

18   locations to a calibrated value. It's just the same ratio going from

19   both columns. They're more or less the same.

20          The next two columns are the window. When a peak– for

21   instance, if you look at TNT, the standard location is 6.070. So the

22   software automatically goes to that location, and then it will look

23   at what is the signal coming from the instrument at the time of

24   6.070 milliseconds, and it will look everything that's there around

25   6.070, plus or minus 0.40 milliseconds.

1          That's the window we are looking at for the TNT. So that's

2    basically your windows for every substance– sorry– for every

3    substance in the instrument. And then the next column is the alarm

4    level. So when a peak is detected at that standard location and still

5    within that window, we check if the peak intensity is above the

6    alarm threshold, and if it's only above that level the alarm is

7    triggered.

8    Q.    And so for the first six or eight– six, seven substances, this

9    particular test run through the Itemiser was negative; am I correct?

10   Is that what "Mode" means?

11   A.    No. The mode is the– if you'll go back to– sorry– the last

12   slide of where you have the plasmagram, so the top one we call the

13   negative mode and the bottom one is the positive mode. The

14   positive and negative was referring to basically if the molecule is

15   ionized as positively or negatively. That's what "mode" means.

16          The narcotics are positive mode and most of the explosives

17   are negative mode. It's basically– if you have cocaine, when you

18   ionize the cocaine, we remove an electron from the cocaine. That's

19   how it becomes positively charged. When you have explosives, an

20   electron is added to that molecules; that's how it becomes

21   negatively charged.

22          This is basically almost mainly for us and help us, when we

23   write the software, to where to go and look for the presence of the

24   peak. It's really– that's only information you can get from that.

25   Q.    I guess my question is, if you look on the far right side, under

1    "Mode," you see negative and positive.  This particular sample, as

2    you've said, was positive for cocaine, but is it also saying it's

3    positive for heroin?

4    A.    No. These modes here has nothing to do with the results.

5    Q.    Okay.

6    A.    These modes are the– it really refers to how the molecule is

7    charged in the ionization chamber.  It has nothing to do if it's

8    positively detected or negatively detected.

9    Q.    I understand.

10   A.    So I know it's little bit misleading.

11   Q.    I understand.  But continuing, if you go down to cocaine on

12   that list and you – what you're telling me is this machine is

13   calibrated so that it looks for 8.566?

14   A.    Yes.

15   Q.    And when it senses that peak an alarm is given inside the

16   machine, right?

17   A.    Yes. It looks really at the position of at 7.936.  If the peak

18   intensity is above the threshold value– in this case it's 750– the

19   alarm is displayed.

20   Q.    Plus or minus that .040?

21   A.    Plus or minus .040, that goes to the time.

22   Q.    So what other substances would be within that plus or minus

23   .40 for cocaine?

24   A.    There is– if you look at hear on our substances list, there is

25   nothing else that will show up even near that cocaine window.

1    Q.    On this list. But what about in the universe?

2    A.    In the universe, there is always a probability that something

3    will show up. But as I explained it before, the instrument, when we

4    build it, we test it with thousands of samples, random samples, that

5    are taken, airports, buildings, anything, just to minimize that false

6    alarm, that not any substance would alarm.

7         And that's where the 750 comes in. So we make sure that

8    when we put that 750– because the instrument, in fact, can detect

9    cocaine even lower than 750. So we put that by just to make sure

10   that nothing else will just generate a cocaine response.

11        So that's where the 750 comes in. And then if we have a

12   signal that is above that value, then we have a very high confidence

13   that it's cocaine and nothing else.

14             THE COURT:  750 what?

15             THE WITNESS:   A unit. It's basically what we

16   measure, is the current of the signal in the detector. So If you go

17   back to– sorry– the left side here of the plasmagram, if you look at

18   the Y-axis, you see from zero to 12,000. This is 750 units. It's

19   basically microamps.

20             THE COURT:  Excuse me. So to a certain extent then

21   you are measuring quantity to the extent you're measuring a

22   concentration?

23             THE WITNESS:    We are measuring, we can quantitate

24   this device. In fact, this device is used in pharmaceutical

25   application exactly the same where they quantify. But we just

1      decided to make the use of it very simple.  We don't require the

2      people to do quantitative calibration.  That's the only thing that's

3      implemented.

4              THE COURT:   So the machine is set at a level that has

5      got to be this concentration before it triggers?

6              THE WITNESS:   Yes.

7              THE COURT:   Before it gives an alarm?

8              THE WITNESS:   Yes, sir.

9              THE COURT:   And I'm sorry, Mr. Eldridge, but I'm

10     trying to keep up with this.  I don't mean to walk on you here.

11             MR. ELDRIDGE:   I think you're helping us, your

12     Honor.  Thank you.

13             THE COURT:   On the graph, the peak, the height of the

14     peak, that peak is measuring what?

15             THE WITNESS:   Is basically when the ions or the

16     molecules travel in the drift tube, they are charged, if you take

17     cocaine or narcotics, they are charged positively.

18             THE COURT:  Right.

19             THE WITNESS:   So when they hit the Faraday cup,

20     they create a current, and what you see is, they produce a current in

21     our device.  So there is a background when there is nothing.  The

22     molecules arrive to the detector and they create a current, and

23     That's what makes what– the peak is generated.

24             THE COURT:   Okay.  So it's measuring the amount of

25     current?

1          THE WITNESS:    Measuring amount of current that are

2    created by the molecules when they hit the Faraday cup.

3          THE COURT:   Will THC, a molecule of THC, generate

4    a different amount of current?

5          THE WITNESS:    They generate different amount of

6    current, and that amount of current is proportional to the amount of

7    THC, but it will generate it at the same time of flight where you see

8    THC.

9          THE COURT:   You anticipated my next question.

10          THE WITNESS:    Okay.

11          THE COURT:   For a particular substance to be

12    identified as THC, cocaine, methamphetamine, whatever, there has

13    to be a known correlation between the peak and its timing?

14          THE WITNESS:    Yes, absolutely, you're absolutely

15    right. And that's exactly what we see here in this display. There is

16    two important things, the time, the standard is a time.  These

17    numbers here, there's no unit, but this is the time when you see

18    6.070 and 6.070 millisecond.  So the time gives you the

19    identifications of the molecule, and then the peak height give you

20    the intensity of that molecule.

21          THE COURT:   What?

22          THE WITNESS:    Intensity of level.

23          MR. WEDDLE:   Intensity.

24          THE WITNESS:     Intensity, sorry.  Excuse my–

25    intensity, i-n-t-e-n-s-i-t-y, intensity.

1          MR. ELDRIDGE:    Intensity.

2          THE COURT:   Oh, intensity.  Sorry.  You've got me off,

3    so have to remember we're all East Tennessee here.

4          THE WITNESS:    Sorry.  So it's two things; you would

5    do identification and then quantification.  So the times give you the

6    qualitative information and the alarm or the peak height give you

7    the quantitative information.

8    By Mr. Eldridge (continued):

9    Q.    Dr. Boudries, is it possible, after you ran this sample, to do a

10   blank sample and still the machine would show cocaine?

11   A.    Yes. But there is a protocol that is well-defined when you use

12   our machine.  When an alarm is triggered, you have to clear the

13   unit. You cannot just sample automatically after that.  Means that

14   there is a protocol that you have to go through to clear the unit.  It

15   means that unit has to go automatically to a ready mode.

16         Ready mode means that there is nothing left in the device

17   before the unit is ready to accept another sample.  So if you follow

18   that protocol, the probability that you have something left from the

19   previous sample is almost zero.

20   Q.    And you have looked at the plasmagrams and the results of the

21   plasmagrams done in this case?

22   A.    Yes, I did. And I even asked that specific questions, and I was

23   told that after every sample you have to clear it, you cannot do

24   anything else unless you clear the device; and even after that a

25   blank was run.  That means that a blank trap was inserted into the

1    device. Then you are guaranteed that there is nothing left into the

2    device. So that was done, to my knowledge, during this analysis.

3    Q.     When the blank was run, did it ever show up for cocaine?

4    A.     I did not look at the plasmagrams, but I was told that the blank

5    were clear. And if an alarm, a blank is done, an alarm was

6    displayed, so you cannot do another sample unless you clear the

7    device.

8    Q.     Do we have a plasmagram for the blank?

9    A.     I do not have plasmagrams for blanks.

10   Q.     Okay. Now, Dr. Boudries, as you've told us, you are an

11   employee of General Electric. How long have you worked for

12   them?

13   A.     Four years.

14   Q.     And is one of your tasks to promote and sell these Itemisers?

15   A.     No. My task is merely research and development. I basically

16   work on just the detection of the device. I'm not involved in

17   selling the device or promoting the device. I'm merely focused on

18   improving the technology, make it more robust, more sensitive,

19   and also understanding the requirement of the customer.

20   Q.     In your professional history, which has been provided to me,

21   you indicate that some of your responsibilities include "Sustaining

22   our commercial products;" am I correct?

23   A.     Yes, you are correct.

24   Q.     And one of those products that you are sustaining is the

25   Itemiser-3, correct?

1    A.    Yes, you are right.

2    Q.    And by sustaining, that means that you want to make sure it

3    stays on the market, right?

4    A.    Yes, absolutely.

5    Q.    So in that sense you are promoting the Itemiser-3, correct?

6    A.    I am not sure to understand exactly your question, but I am

7    working hard to make our– all of our product be accepted by every

8    users or new users in the market.  So I try to make sure and

9    understand what the customers want and try to translate that to

10   detection performance and implement that in our instruments.

11   Q.    Okay.  The particular device that was used in this case is, in

12   fact, an Itemiser-3?

13   A.    Yes, it is, and it is displayed also in the plasmagram.  The

14   name of every product is displayed on each plasmagram.

15   Q.    And as you said, it is a desk top device?

16   A.    Yes, it is a desk top device.

17   Q.    Do you know the history of that particular machine?

18   A.    To be honest with you, I don't know when the machine was

19   built.  I think it's– when I joined GE in 2005, the instrument was

20   already commercialized.  But I don't know exactly.  We have

21   Itemiser-2's; that is the first generation; Itemiser-3 is the next

22   generation, and we have right now the Itemiser-DX, which is the

23   new generation of desk top device.  But I don't know when was the

24   Itemiser-2 released to the market.

25   Q.    And the DX, of course, would be better than the Itemiser-3?

1  A.    The new, of course, we always try to improve the detection

2  performance of all of our product.

3  Q.    And it would be more accurate?

4  A.    I would say more sensitive.  The accuracy is the same because

5  all devices uses the same detector.  It's just to improve the

6  sensitivity of the device.

7  Q.    Dr. Boudries, you indicated that the machine has been

8  certified.  What did you mean by that?  Who certifies the machine?

9  A.    The Itemiser-DX was certified by TSA, Transportation

10  Security Administration.

11  Q.    I'm talking about the Itemiser-3.  When you say certified–

12  A.    Oh, it was certified by European agency called ENAC, E-n-a-

13  c. the Itemiser-2 was certified by TSA and the Itemiser-3, the same

14  one that has been used here, was certified by ENAC.

15  Q.    What's ENAC?

16  A.    I can't remember exactly the– it's the equivalent of TSA in

17  Italy.

18  Q.    So there isn't a world-wide certification process, is there?

19  A.    Yes, there is.

20  Q.    There is?

21  A.    Yes.

22  Q.    So none of these machines were certified by a world-wide

23  certifier; am I correct?

24  A.    We try to– basically, every country, they have their own

25  requirements for every device.  So what we try to do, we try to

1    deploy our device to every agency and get it certified. There is no

2    one certification for the entire plant. Every country has its own.

3    So that's what you try to do, we try to certify all product in almost

4    every country.

5    Q.    So what you did with TSA was to give TSA a number of these

6    machines?

7    A.    Yes. There is a well-defined protocol that we have to follow.

8    It's published by TSA for every, basically, vendor. And you have

9    to provide them with the unit and they just test it.

10   Q.    So you give them a bunch of these machines hoping that they

11   will then endorse your product and buy it?

12   A.    No. The TSA– sorry. It's the TSL. This is the organization

13   that certified the product; they don't buy product. Their main

14   function is to certify the product. They only look at the detection

15   performance of the device. The agency who make the decisions to

16   buy are completely different.

17        So there is a lab, a governmental lab. Their main functions

18   are to evaluate the performance of the device. The people who

19   make the decisions are completely different. They just want to

20   know is this instrument certified, yes or not.

21   Q.    And when you say that you sent your machines to be analyzed

22   by the government, what did the government say was wrong with

23   these machines? What criticisms did they have?

24   A.    First of all, the government don't tell us what's wrong. There

25   is a few things they can share with us, and some of the information

1   I cannot share with you or we just know that if it doesn't meet the

2   requirement it cannot be certified.  So there is something they can

3   ask us, oh, can you please modify this, can you add this feature, we

4   would like you to do this.

5          But the detection performance, if you don't meet the detection

6   performance, the instrument is not certified.  And the results of the

7   certification are classified.  I cannot share them with you.

8   Q.     So make sure I understand, going back  to your Exhibit Two,

9   when this plasmagram says there's cocaine, it's not measuring how

10  much cocaine, is it?

11  A.     Well, if you look at the second column, you see the time,

12  7.857, and you see the height is 5381.  Five thousand three hundred

13  eighty-one, that's your peak, peak height.  And if you look at the

14  top, it says cocaine, it gives you the time and it gives you the

15  strength.

16          The strength, basically, it's almost a ratio between– there is

17  other factor that are taken into account calculate the strength.  It

18  gives you how intense is the peak so you have some informations

19  about the strength of your cocaine detection.  And it's displayed on

20  the right side of the plasmagram.

21  Q.     My question is, what does that mean?  I mean, it says,

22  "Strength, 1.02," but how does that translate?

23  A.     Basically, that all translates to the detection of the cocaine.

24  As I said, there is a certain level which is, in this case, for instance,

25  750.  If there is a peak at that specific location that can be

1    attributed to the cocaine, we try to see how strong is that peak.

2    And that's then the value that is displayed there, is the ratio

3    between what we think is the background of the cocaine at time of

4    flight to the intensity of the peak that you just analyzed during that

5    sample.

6         So that's the strength. But the peak height, it's also a good

7    indication of the intensity of the peak. So the peak height here is

8    5,381 and the threshold is around 750, which is almost seven times

9    higher.

10   Q.    You indicated that the Itemiser is not as good or this

11   particular technology is not as good as the gas chromatograph; am I

12   right?

13   A.    I did not say it is not as good. They are completely two

14   different devices, they have different applications. They are

15   designed differently. In fact, the ion mobility spectrometer is

16   extremely sensitive device, and it's very simple. But I don't think

17   we can attribute the word "are not as good as."

18   Q.    Well, can you do this kind of test on a GCMS?

19   A.    Oh, absolutely. I think you can find many different

20   techniques that you can use or you can develop to analyze

21   narcotics. I'm sure that there is, yes.

22   Q.    In your direct examination you talked a little bit about

23   operator error and calibration, and you've told us that the

24   supervisor can change the time of calibration to a shorter window

25   than eight hours; is that correct?

1    A.    Yes, they can, yes.

2    Q.    Can they increase the time?

3    A.    I can't remember. I don't think that they can. I think the

4    option in the software is four hours and eight hours, but I don't

5    think we have something that is above eight hours.

6    Q.    And you say the machine calibrates itself?

7    A.    Yes. There is an auto-calibration mode. When you are–

8    excuse me– when you are in operator mode, there is a button called

9    "auto-cal," and the only thing the user has to do is just insert the

10   calibration traps and that's it.

11   Q.    So you're actually running another plasmagram–

12   A.    Yes. Yes, sir.

13   Q.    –to calibrate?

14   A.    Yes.

15   Q.    You have indicated that this ion mobility spec–

16   A.    Spectrometry.

17   Q.    –thank you –spectrometry has a two per cent error rate. Did

18   you tell us that?

19   A.    Yes. Less than two per cent.

20   Q.    How is that determined?

21   A.    It's basically these are the– when we built the unit, we go in

22   the field, we take several thousands of samples, and we try to

23   characterize the detection parameters so that the false alarms will

24   not generate a number that is above two per cent. So that's how we

25   determine that.

1          So, basically, as I said, we take thousands of sample on almost

2    everything we can, and we can always process data.  Every data we

3    take we can get it in our database and just run it if we think it's a

4    blank.

5    Q.    When you say 7,000 samples, is that 7,000 samples of things

6    that you know what it is?

7    A.    We don't necessarily need to know where it is.  We can just go

8    in a room like this and take thousands of sample, almost every

9    corner.  We go outside, we go in a car,  buildings, airports, bags.

10   We try to sample as much as we can, almost everything.  And then

11   we add all of that in our database.  That represents our background

12   level and that's how we determined that 750.  We can say we

13   analyzed almost everything we can get of, and then we think if we

14   are below 750, nothing would alarm on cocaine.

15         So if we see something above that threshold then we can

16   attribute that level to, for instance, cocaine, or any other substance.

17   Q.    What I'm asking is, when you say you take all these samples,

18   you're not testing it against a known quantity, are you?  You're

19   just taking samples?

20   A.    Yes.

21   Q.    How can you use 7,000 samples of things that you don't know

22   what they are to tell you what kind of error rate it has?

23   A.    It does not really matter because what you are looking at is

24   interferent, so it can be anything.  I don't need to know exactly

25   what I have on the sample.  I just want to know if anything that is

1    on the trap is going to show up exactly as the time of flight of

2    cocaine. That's the information I'm looking at.

3         I don't need to know what's on the trap. I just want to know,

4    if there is anything there, is it going to show up at the same time of

5    flight as cocaine. So we don't need to know what's on the trap. In

6    fact, you want just to analyze, insert the trap into the device.

7    Q.    So how do you get a false positive?

8    A.    So basically all of this, if we– for instance, if you do the blank

9    analysis and one of them will give you a big height above that,

10   what we think, 750, that we have designed; that's a false positive.

11   So we take first all these blank samples, we analyze all of them, we

12   go and look.

13        All of them, what is their response at the specific time where

14   we expect to see cocaine? That's where we put that threshold. So

15   and then we can say we think that only two per cent or less are

16   going maybe to give us either a false positive or a false negative.

17   Q.    What I'm asking is, what causes it?

18   A.    Oh, it can be anything. It could be another molecule, it could

19   be somehow another molecule that is injected into the device that

20   has a similar drift time in our device that would show up somehow

21   at the same time as cocaine and will just pop up there. That's– it

22   could be anything.

23   Q.    Does the operator require any training?

24   A.    Yes, it does.

25   Q.    What training does the operator–

1    A.    Oh, we offer different trainings.  There is operator training,

2    supervisor, superuser, advanced training.  And I think people,

3    when they buy our instrument, so they offer them the package and

4    they have to select what they want to do.

5    Q.    Do you know what the operator in this case had?

6    A.    No, I don't know.

7    Q.    Are you aware of some problems that have been generated

8    from this machine?

9    A.    Can you please specify what you mean by problems?

10   Q.    Well, for example, I have heard that, if you look at currency,

11   you'll find trace amounts of cocaine on currency;  is that right?

12   A.    Yeah, you're absolutely right.

13   Q.    So if I handle currency and somebody swabbed my hand, there

14   is a probability, to use your word, that this Itemiser would say that

15   I had cocaine on my hand?

16   A.    You are absolutely right.  If you sample currency directly,

17   there is a chance that you would see some narcotics.  I don't think

18   that if you sample your hands you will find cocaine.  It's only if the

19   currency really had a huge amount of particles from cocaines or

20   any other narcotics, then maybe by doing a double transfer you can

21   find cocaine in your hands.  So, yes, there is a probability you find

22   cocaine.

23   Q.    Have you heard of problems that– well, this machine is used

24   by prison authorities, isn't it?

25   A.    Yes, you are right.

1    Q.    And there's been some publicity about false alarms from these

2    prisons, correct?

3    A.    Yes, you're correct.

4    Q.    Can you tell us– and, in fact, the Federal Bureau of Prisons

5    has discontinued the use; have they not?

6    A.    Yes. They did not discontinue to use. What they found out,

7    what's happened, is that some of the hand sanitizers generated

8    THC false alarms. That was not– the hand sanitizer coming right

9    now in use. And what we have done, in fact, we developed filters,

10   basically, to remove all alarms that are caused by hand sanitizer.

11        Thus, what's happened is that, when they saw that there is

12   false alarm that is caused by just people going to prison for

13   visiting, so we developed a filter in effect to remove all interferent

14   coming from hand sanitizers.

15   Q.    And have you heard that these alarms are generating false

16   positives on cocaine from–

17   A.    No, not on cocaine. They were generating false alarms on

18   THC and heroin.

19   Q.    Now, this drift time that you spoke of, that can be affected by

20   atmospheric pressure, can't it?

21   A.    Yes, it can.

22   Q.    And so if there's inclement weather, that could affect the drift

23   time and affect the reading on the machine, correct?

24   A.    Yes, it can, if the instrument is not calibrated. The calibration

25   is function of temperature and pressure.

1    Q.    And even if you moved it a few hundred feet in elevation, that

2    would affect it?

3    A.    Yes.

4    Q.    All right.  These systems have what might be called a

5    chemical module in them, correct?

6    A.    Chemical model?  What do you mean?

7    A.    Well, do you have to replace parts of the machines

8    periodically?

9    A.    Yes, sir.  Some– the dopants, for instance, you have to replace

10   them every four months for the ammonia and about eight to 12

11   months for dichloromethane.

12   Q.    And would that have to be done on the machine that was used

13   in this case?

14   A.    Yes, all of our machines.

15   Q.    And is that an expensive proposition?

16   A.    To be honest with you, I don't know exactly what's the cost of

17   the buying dopants and ammonia from our company.

18   Q.    What happens if they're not replaced?

19   A.    The instrument will not work, so you will have a hard time to

20   calibrate, you would have a lot of false alarms and basically almost

21   the instrument would be useless because you won't be even able to

22   calibrate your units.  So if the unit is not calibrated, you cannot do

23   any, any sample.

24   Q.    And the way you tell if the machine is calibrated is the

25   machine tells you it's calibrated?

1    A.    Yes. The machine tells you it's calibrated, yes.

2    Q.    So you punch a button and say "calibrate," and it does it and

3    then tells you it's done it?

4    A.    Yes.

5    Q.    And if there's something wrong with the way it calibrates,

6    that's just the way it is?

7    A.    Not necessarily true, because if you look at here on the

8    plasmagram that you just have– if you go to the right side. So

9    what you see here is that if someone miscalibrated the device, I

10   could figure out that very quickly. So not only the parameters, the

11   response of the system, is displayed, but also how the instrument is

12   run.

13        So I can look at what we have here and I can find out exactly

14   if the unit was calibrated or not. So that's one thing. So there is

15   two lines here that are very important; it's called "N-Cal" and "P-

16   Cal" on the bottom. You can see it here where there is the arrow.

17   That's a very important number.

18        If someone has miscalibrated, I can tell you very quickly if

19   there was a miscalibration. That's one thing. If you go back to the

20   plasmagram, I can also speak a little bit. Here, when I looked at the

21   plasmagrams this morning or also yesterday, the first thing I want

22   to look at is the dopant position. Usually if the instrument has

23   been miscalibrated or the instrument was not running at its

24   optimum condition, you would see a shift in the dopant position in

25   both the positive and negative mode or sometimes you see that the

1    peak intensity is not very high, and it was not the case.

2        So that was the first thing I checked when I looked at the

3    plasmagram, is just to insure that the instrument was operating and

4    running in its proper condition. So– and it was, and if it wasn't, I

5    can look at just the plasmagram and I can tell you that there was

6    something wrong with it.

7    Q.    You said, from what we're looking at on the screen, you

8    indicated you can tell the dopant?

9    A.    Yes. The dopant positions, yes.

10   Q.    Where is that?

11   A.    You see on the left column, the first peak, 3.211?

12   Q.    Yes.

13   A.    That's the dopant position for dichloromethane. So it tells me

14   that is in the right position, that there is no water vapor in the

15   system, everything is dry. And then also I looked at the other

16   plasmagram with the positive. I just checked what was the

17   ammonia dopant position, and it was also on the right time.

18       So I basically did just a check to make sure that all the

19   temperature flows, the cal-factors, dopant position, all seemed

20   reasonable and good, and they were all, in my opinion, on the right

21   position.

22   Q.    So the dopant position is the left hand column and the peak

23   height is the right hand column?

24   A.    Yeah. The dopant position, the first column, the first number,

25   3.211; that's our dopant.

1    Q.    What does the number under it mean?

2    A.    Three-point-two-one-one, and you see here, is one point–

3    1382, that's the peak height.

4    Q.    No. I'm sorry. The number under 3.211, what does that mean?

5    A.    Oh, these are all the peaks that are on the plasmagrams. See,

6    you see there is many peaks on the plasmagrams on the top. The

7    first one is our dopant, is our dopant position.

8    Q.    The others are peaks?

9    A.    The other peaks that can just come from the sample. And if

10   you look at the blank position, I think there was one plasmagram

11   that I looked at, you can see these peaks are very nice, very sharp,

12   on the right time of flight, and the intensity was very big. And the

13   reason here they are small is because they are reacting with other

14   substance, which means when there is other chemical they react,

15   there is a chemical reaction also in our device. That's why they are

16   small.

17          And also I would just want to say something. When the

18   calibration was performed, I was told that the verification was also

19   performed. Basically, when you do a calibration, the calibration

20   does what it does, is calibrate your time of flight. That's the only

21   thing the calibration does in our device.

22          It means that you calibrate it and then we know if something

23   will show up at six milliseconds is TNT. And then I was told that

24   even after the calibration was performed, they did a verification.

25   Means, assuming that the calibration was performed correctly, you

1   verify by injecting other chemicals.

2       The other ones they injected was RDX and ephedrine, and in

3   every case they detected RDX and ephedrine, which is the

4   confirmations that all the calibrations were performed correctly.

5               MR. ELDRIDGE:   Thank you, doctor.

6               MS. PLOWELL:   We have nothing further, your Honor.

7               THE COURT:  Fascinating.  Thank you.

8               THE WITNESS:   You're welcome.  Thank you.

9       (Witness excused.)

10              THE COURT:  Mr. Eldridge, or Ms. Plowell, as the case

11  may be, do either of you want to supplement your briefs, in light of

12  Dr. Boudries' testimony, what I've heard here this morning?

13              MS. PLOWELL:   I don't need to supplement my brief,

14  your Honor.  I'm happy to make a closing argument on it, if you'd

15  like, with regard to the Daubert issue. I think that my brief is clear.

16              THE COURT:  How about you, Mr. Eldridge?

17              MR. ELDRIDGE:   No, your Honor.

18              MS. PLOWELL:  Would you like closing argument on

19  it?

20              THE COURT:  Well, I don't really think I need that.  I

21  mean, we know, all of us know, what Daubert says, and all of us

22  know what Rule 702 and 703 says.  It's a matter of plugging in

23  what Dr. Boudries has testified to into that.

24              MS. PLOWELL:   Your Honor, if I could just– I did find

25  yet another case accepting, admitting the ion scan under Daubert

1    last night, and I just wanted to give it to you, if I could. It's <u>United</u>

2    <u>States vs. Law</u> (phonetic), which is at 381 F.3d 888, in the D.C.

3    circuit, 2008.

4         THE COURT: I'm sorry. What is the cite again?

5         MS. PLOWELL: It's <u>United States vs. Law</u> (phonetic)

6    381 F.3d 888, D.C. circuit, 2008. And also I could give you some

7    more. I think I have listed them in my papers, but if you need

8    more, I have them.

9         THE COURT: Okay. Ms. Plowell and Mr. Eldridge,

10    Mr. Young, anything else that we should address before we close

11    the proceedings?

12         MR. YOUNG: No, your Honor, not on behalf of Mr.

13    Smith.

14         MR. ELDRIDGE: I have nothing further, your Honor.

15    Thank you.

16         THE COURT: Very well. Adjourn court.

17       (Hearing concluded at 11:45 a.m.)

18                  **C E R T I F I C A T I O N**

I certify that the foregoing is an accurate transcript of the record of proceedings in the titled matter.

      _/s/Donnetta Kocuba_                 _3/19/11_

Donnetta Kocuba, RPR-RMR
Official Court Reporter
U.S. District Court
Knoxville, Tennessee